# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, ex rel. LISA HUNTER, an individual,<br><br>Respondents,<br><br>v.<br><br>JASON LOWERY and JANE DOE LOWERY, and the Lowery community,<br><br>Appellants,<br><br>RELATIONSHIPS TOWARD SELF-DISCOVERY, INC., a Washington corporation; LAIRD RICHMOND, JANE DOE RICHMOND, and the Richmond community estate,<br><br>Defendants. | No. 79959-2-I<br><br>DIVISION ONE<br><br>PUBLISHED OPINION |

APPELWICK, J. — Lowery appeals the judgment in a bench trial finding him liable for violating the Washington False Claims Act, chapter 74.66 RCW. The judgment is based on the submission of false expense claims in the annual reconciliation against moneys advanced for care of state disability clients. Lowery claims he cannot be liable because (1) he was only an employee and not an owner or control person of RTS; (2) he did not personally prepare the fraudulent reports; and (3) the State was aware of his allegedly false billing practices and continued to pay his claims. He also claims the trial court erred in finding a conspiracy

Citations and pin cites are based on the Westlaw online version of the cited material.

between himself, the owner, and RTS. We strike the findings relating to withdrawn and unstated violations. We otherwise affirm.

FACTS

The Washington State Developmental Disabilities Administration (DDA) contracts with private companies to provide services to developmentally disabled adults. DDA is a division of the Department of Social and Health Services (DSHS). Relationships Toward Self Discovery, Inc. (RTS) was a supported living program that contracted with the DDA to provide staffing and supervision services for this purpose.

DDA and RTS had regular rate setting meetings to estimate the compensation due to RTS per client. This process involved projecting how many hours of care each client needs. It began with DDA determining the base level of support that a client needs. This rate was then adjusted to account for the clients' actual living situation. For clients who live in a group setting, staff are expected to care for multiple clients, such that clients can "share" staff hours. During the night, when clients are presumed to be sleeping, one staff member might be expected to provide support for four clients. Thus, even though a client may require 24 hours of support in a day, the adjusted hours that DDA authorizes during rate setting meetings might be only 12 hours.

DDA paid RTS on a monthly basis. RTS was required to submit an annual cost report that reconciled funds received with services actually provided to clients. If the cost report revealed that RTS had been paid for service hours it didn't actually provide to clients, it would have to reimburse DDA for those services.

2

RTS clients require 24 hour supervision. RTS provides this supervision with a "live in" staffing model. In this model, staff sleep at residential facilities and are available to assist clients with whatever needs they may have during the night. RTS staff were not paid an hourly wage for sleep hours unless they awoke to care for a client.

RTS was paid for its work through a contract with the DDA. Its mission is to provide home, community, and facility based residential and employment supports. The DDA contracted with RTS to provide these services. As a DDA contractor, RTS received payments through the DDA from Medicaid.

The dispute in this case involves RTS's reporting of sleep hours in cost reports from 2012, 2013, 2014, and 2015. In those cost reports, RTS reported sleep hours as paid hours worked, but it did not pay employees for those hours unless they were awakened to provide care.

Laird Richmond was the owner of RTS. Jason Lowery was the director of RTS. Lisa Hunter was a contracted bookkeeper for RTS from 2004-2015. Hunter prepared the 2012, 2013, and 2014 cost reports. Lowery and Lisa Aird, Hunter's successor, prepared the 2015 report.

Hunter testified that she reported unpaid sleep hours on the cost reports determined by a formula given to her by Lowery. DDA guidelines instruct providers to include only paid hours worked in cost reports as reimbursable service hours. These guidelines appear in a DDA policy manual, rather than the Washington Administrative Code. Sleep hours may be included only to the extent that the number is adjusted to include only actual paid hours worked.

3

Hunter understood that sleep hours should not be submitted for payment unless they were actually paid to employees. She raised these concerns with Lowery "continually . . . year after year." She also had a meeting with Lowery in April 2015, after several cost reports had been submitted, in which she tried to stop RTS from continuing to submit unpaid sleep hours. She testified that Lowery's response to her objections was to say, "[S]omething has to be done. I'm going to lose my business and my house."

She also raised her concerns with Richmond. On April 15, 2015, she sent a long text message to Richmond outlining why the way in which she was being instructed to report sleep hours was inappropriate. RTS terminated Hunter's contract the following month.

Hunter thereafter filed a qui tam complaint against RTS, Richmond, and Lowery.[1] She alleged that they violated the Washington Medicaid False Claims Act (WAFCA), chapter 74.66 RCW, and employment discrimination. The State intervened, filing its own complaint against the defendants alleging violations of the WAFCA, common law fraud, unjust enrichment, and conversion.

RTS ceased doing business in 2016 and is now defunct. Richmond died in 2017. Both defaulted on the claims against them. Only Lowery actively participated in the defense of these claims.

Both sides moved for summary judgment. The trial court denied both motions. The trial court then held a four day bench trial. At summary judgment,

---

[1] RCW 74.66.050 allows a person to bring a civil action for a violation of RCW 74.66.020 on behalf of themselves and on behalf of the government. The person bringing the action is known as a "qui tam relator."

the State's counsel orally represented that it was pursuing only its claim that Lowery violated RCW 74.66.020, and not any others. Specifically, the State alleged a violation of RCW 74.66.020(1)(g), that imposes liability for submitting false statements related to an obligation to pay the State. The parties agree that the State submitted only the WAFCA claim for adjudication by the court.

Nevertheless, the trial court entered findings of fact and conclusions of law finding the defendants liable for all the State's original claims. Lowery moved for reconsideration, arguing that he should not be liable for claims the State had abandoned. The trial court requested additional briefing, including any other proposed changes to the findings that Lowery wished to make. The trial court issued new findings accepting that the State had dropped all claims except for a violation of the RCW 74.66.020(1), but affirmed that Lowery was liable under that claim. The trial court found Lowery liable for violating RCW 74.66.020(1) subsections (a)-(b), that relate to claims for payment, subsection (c), related to conspiring to violate the statute, and subsection (g), related to obligations to pay the government.[2]

Lowery appeals.

## DISCUSSION

Lowery makes seven arguments. First, he argues that he cannot be liable under the WAFCA because he is not an owner or control person of RTS. Second,

---

[2] The trial found that RTS, Laird, and Lowry violated RCW 74.66.020(1) in five ways. Each conclusion of law is labeled as a subsection which mirrors the language of the subsections of RCW 74.66.020(1). Subsections (a)-(d) in the conclusions of law correspond to RCW 74.66.020(1)(a)-(d). Subsection (e) of the conclusions of law corresponds to subsection (g) of the statute.

5

he claims that he cannot be liable under WAFCA because he did not prepare, review, certify or submit the fraudulent cost reports. Third, he argues that he cannot be liable because the State had prior knowledge of RTS's reporting practices but still paid RTS's claims. Fourth, he argues that the trial court erred in finding he conspired to violate WAFCA without evidence of an agreement to conspire to accomplish an unlawful purpose. Fifth, he claims the intracorporate conspiracy doctrine bars a finding of conspiracy in this case. Sixth, he argues that cost reports are not "claims" under RCW 74.66.020(1)(a). Last, he argues that he did not act "knowingly" under RCW 74.66.020(1).

As an initial matter, Lowery argues that all of his assigned errors are entitled to de novo review. This case presents both legal and factual questions. We review the trial court's conclusions of law and statutory interpretations de novo. McCleary v. State, 173 Wn.2d 477, 514, 269 P.3d 227 (2012). We review the trial court's challenged findings of fact for substantial evidence. Id.

## I. Liability for Non-owners

Lowery argues first that he cannot be liable under WAFCA because he is not an owner or control person of RTS.

RCW 74.66.020(1) provides,

[A] person is liable to the government . . . if the person:

    (a)    Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

    (b)    Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

    . . . .

6

(g)     Knowingly makes, uses, or causes to made or used a false record or statement material to an obligation to pay or transmit money or property to the government entity, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the government entity.

RCW 74.66.010(11) defines "person" as "any natural person, partnership, corporation, association, or other legal entity, including any local or political subdivision of a state."   The trial court found that Lowery is a "person" for the purposes of the State's WAFCA claims.

Our goal in interpreting statutes is to ascertain and carry out the legislature's intent.  State v. Alvarez, 128 Wn.2d 1, 11, 904 P.2d 754 (1995).  If the language is clear on its face, courts must give effect to its plain meaning and assume the legislature means exactly what it says.  State v. Chapman, 140 Wn.2d 436, 450, 998 P.2d 282 (2000).

Such is the case here.  The statute clearly places liability on any "person" who commits one of the acts listed in RCW 74.66.020.  It provides a definition for "person" that includes "natural person[s]."  RCW 74.66.010.  Lowery would have the court interpret that definition to require that the "person" must be an owner or control person of a company on whose behalf the false claim was submitted.  The statute contains no such limitation on liability.  And, Lowery cites no case law to support the addition of an "owner" or "control person" requirement to the statute.

We affirm the trial court's finding that Lowery is a "person" subject to liability under WAFCA.

II. Cost Reports as a "Claim"

Lowery argues that the trial court erred in finding him liable under RCW 74.66.020(1)(a)-(c) because the cost reports are not a "claim" as defined by the statute. The trial court found that Lowery violated RCW 74.66.020(1) by "knowingly . . . causing . . . false or fraudulent claims [to be submitted]," and "knowingly making . . . false records or statements material to the false or fraudulent claims."

RCW 74.66.020(1) establishes several bases for liability. Subsections (a)-(b) establish liability when a person submits false claims "for payment" or false statements in support of those claims. The trial court found liability based on fraudulent reporting of sleep hours in cost reports. Lowery is correct that the cost reports were not "claims for payment." Rather, the cost reports reconcile RTS's obligation to reimburse the State for payments already made to RTS.

For this reason, the State made clear at trial that it was not alleging Lowery was liable under subsections RCW 74.66.020(1)(a)-(b). Rather, the State alleged liability attached under RCW 74.66.020(1)(g). That subsection imposes liability on a person who causes a false record or statement "material to an obligation to pay . . . the government entity or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay . . . the government entity." RCW 74.66.020(1)(g). The cost reports fit squarely in that subsection, because they determined the amount RTS was obliged to refund the State for overpayment over the year. The trial court found Lowery was liable under this subsection as well.

8

We agree that the trial court erred in finding that Lowery submitted false "claims for payment" under RCW 74.66.020(1)(a)-(b), because the cost reports at issue did not cause the State to pay RTS. Therefore, we strike the findings related to subsections (1)(a)-(b).[3] However, the trial court did not err in finding that submission of the cost reports violated RCW 74.66.020(1)(g). Thus, the erroneous findings related to subsections (1)(a)-(b) are harmless. We affirm that providing false information in cost reports was a violation of the statute.

III. Causation

Lowery argues next that he is not liable because he did not prepare, review, certify, or submit the fraudulent cost reports. The trial court found that Richmond and Lowery "caused" the fraudulent cost reports to be submitted to the State. Causation is generally a fact question for the trier of fact. Hertog v. City of Seattle, 138 Wn.2d 265, 275, 979 P.2d 400 (1999). We do not disturb findings of fact that are supported by substantial evidence. McCleary, 173 Wn.2d at 514. Substantial evidence exists if the record contains evidence sufficient to persuade a fair-minded, rational person of the truth of the declared premise. In re Custody of A.T., 11 Wn. App. 2d 156, 162, 451 P.3d 1132 (2019). The party claiming error has the burden of showing that a finding of fact is not supported by substantial evidence. Id.

Lowery seeks to minimize his role in causing the submission of the false statements in the cost reports. He argues that he did not prepare, certify, or review

---

[3] Those findings are found in the trial court's conclusions of law, section B, paragraph 6, subsections (a)-(b).

the reports. Instead, he characterizes his role as "merely a conduit facilitating a transfer of the required documents between [Hunter] and Richmond."

Lowery's description is not supported by the record. When asked what role Richmond played in the preparation of the reports, Hunter replied, "He signed it." When asked if Richmond did any other work on the reports, she replied, "No." Hunter testified that Lowery was much more "hands on" in the preparation of cost reports than Richmond. She further testified that Lowery gave her the formula with which to determine the number of sleep hours to submit in the cost reports. She also testified that Lowery would adjust the formula to make sure it was "on target" for the appropriate number of hours. Hunter understood that sleep hours should not be submitted for payment unless they were actually paid to employees. She raised these concerns with Lowery "continually . . . year after year." She also had a meeting with Lowery in April 2015, after several cost reports had been submitted, in which she tried to stop RTS from continuing to submit unpaid sleep hours. She testified that Lowery's response to her objections was to say, "[S]omething has to be done. I'm going to lose my business and my house." This evidence is sufficient to persuade a rational, fair-minded person that Lowery caused the false statements in the cost reports to be submitted.

We affirm the trial court's finding that Lowery caused the false report to be submitted.

## IV. State's Knowledge

Lowery argues that he cannot be liable because the State was aware of RTS's practices around sleep hours in cost reports and paid anyway.

Whether or not the State actually had knowledge of RTS's billing practices is a question of fact. We review questions of fact for substantial evidence. McCleary, 173 Wn.2d at 514. Lowery points to the "extensive" involvement of the State in the rate setting process with RTS. He claims that RTS was transparent with the State about its billing practices during these rate setting meetings. The State characterizes these meetings differently. It argues that the purpose of these meetings was not to discuss billing practices, but to set the value of services provided to clients. The State argues it was unaware that RTS was submitting unpaid hours for payment by the State.

Substantial evidence supports the State's position. An employee of RTS testified that RTS was "totally transparent" about billing practices concerning sleep hours. But, a DSHS employee who discussed rate setting with RTS testified that billing and reimbursement practices were not discussed at rate setting meetings. And, Lowery points to no documentation that he submitted to the State showing that RTS was submitting unpaid hours for payment by the State.

Hunter confronted Lowery about the cost reports in 2015. Lowery did not assert that he had informed the State of the practice. Rather, he said, "[S]omething has to be done. I'm going to lose my business and my house." Taken together, this evidence is sufficient to convince a fair-minded, rational person that the State was unaware that RTS was submitting unpaid sleep hours for payment by the State.

We affirm the trial court's finding that the State was unaware RTS was submitting unpaid sleep hours for reimbursement.[4]

V. Lowery's Knowledge

The trial court found that Lowery acted "knowingly" in violating WAFCA. Lowery argues this was an error.

We review questions of fact for substantial evidence. McCleary, 173 Wn.2d at 514. RCW 74.66.020 imposes liability only on a person who acts "knowingly." The statute defines "knowing" as actual knowledge of the information, and acts in deliberate ignorance of the truth or falsity of the information or acts in reckless disregard of the truth or falsity of information. RCW 74.66.010(7)(a).

Lowery argues that he did not act knowingly because he believed that RTS's reporting of sleep hours was permissible. He relies primarily on an overtime audit of RTS by the United States Department of Labor (DOL). He claims that, through this audit, DOL confirmed that RTS's practice of not paying sleep hours unless the employee's sleep is interrupted was permissible under DOL regulations. He claims this creates a "conflict" between DOL regulations and DDA policies. This is not so. Whether or not employees may be unpaid for sleep hours under DOL regulations has nothing to do with whether or not RTS may submit those unpaid hours for payment to RTS by the State of Washington.[5] And, Lowery has

---

[4] Because we find that the State was unaware of RTS's billing practices, we need not address whether such knowledge is a defense to liability under the WAFCA.

[5] At oral argument, Lowry sought to argue that there is also a discrepancy in the DDA policy statement. He claims this is so because, while the DDA policy indicates that only actual paid hours worked may be submitted for reimbursement, a different subsection allows that sleep hours may be submitted in certain

not explained why the federal DOL would have any authority to provide guidance on Washington DDA policies concerning reimbursement for patient services.

Lowery argues that the only evidence in the record that RTS was aware it was not in compliance with DDA policies was a 2015 text message from Hunter to Richmond that Lowery was not aware of. That is not true. Hunter testified that she also brought her concerns directly to Lowery. She testified that she did this "continually . . . year after year." And, the trial court specifically found that Lowery's testimony that he believed the reporting of unpaid sleep hours was permissible was not credible. This evidence is sufficient to persuade a rational, fair-minded person that Lowery acted knowingly with respect to the fraudulent reporting of sleep hours.

We affirm the trial court's finding that Lowery acted knowingly in the fraudulent reporting of sleep hours.

VI. Conspiracy

Lowery argues the trial court erred in finding that he conspired to violate the WAFCA. The trial court found that Lowery and Richmond violated WAFCA by conspiring with each other to do so.[6] The State did not allege Lowery conspired to violate WAFCA. Rather, the State alleged that the defendants were jointly and

---

situations. There is no ambiguity. The first subsection establishes a baseline that only paid hours worked may be reported. The following subsections clarify what types of paid hours may be reported. Thus, that a subsection allows that sleep hours may be reported in certain situations, it presumes that those hours must actually be paid to employees in order to be reimbursed.

[6] That finding is found in the trial court's conclusions of law, section B, paragraph 6, subsection (c).

13

severally liable. Lowery therefore did not have notice to defend himself from a conspiracy charge. The trial court's findings related to conspiracy are error.

However, Lowery does not challenge the trial court's determination that he can be jointly and severally liable under the statute. He has not argued that liability should be apportioned or that he cannot be jointly and severally liable.

The trial court found Lowery, Richmond, and RTS liable as individuals for causing false statements material to their obligations to pay the State. That alone is enough to confer liability on Lowery. RCW 74.66.020(1)(g). A finding of conspiracy was therefore unnecessary. We find that the trial court erred in finding Lowery conspired to violate WAFCA, but that the finding is harmless and does not affect the judgment.

We strike the findings relative to RCW 74.66.020(1)(a)-(c) and to conspiracy. We otherwise affirm the judgment.

_Appelwick, J._

WE CONCUR:

_Bowman, J_          _Verellen J_

14