**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

**DIVISION II**

| | |
|---|---|
| ZAID WOLDEMICAEL, | No. 54220-0-II |
| Appellant, | consolidated with |
| v. | |
| STATE OF WASHINGTON DEPARTMENT OF SOCIAL AND HEALTH SERVICES, | |
| Respondent. | |
| ZAID WOLDEMICAEL, | No. 54230-7-II |
| Appellant, | |
| v. | |
| STATE OF WASHINGTON DEPARTMENT OF SOCIAL AND HEALTH SERVICES, | PART PUBLISHED OPINION |
| Respondent. | |

GLASGOW, A.C.J.—Debora,[1] a vulnerable adult living in Win Adult Family Home, choked while eating her dinner. Zaid Woldemicael, the adult family home care provider, was nearby preparing dinner for other residents and had her back turned. When Woldemicael realized Debora was in distress, she called 911 and followed the dispatcher's instructions. Sadly, Debora could not be revived.

---

[1] Because Debora was a vulnerable adult, we use only her first name.

The Department of Social and Health Services investigated Woldemicael, found that she neglected a vulnerable adult and violated multiple administrative regulations governing the operation of adult family homes, and revoked her license. After a hearing, an administrative law judge (ALJ) reversed. The Department's Board of Appeals then reversed the ALJ's decision and reinstated the Department's neglect and licensing findings as well as the license revocation. The superior court affirmed the Board's decision. Woldemicael appeals.

In the published portion of this opinion, we hold that the appropriate standard for neglect of a vulnerable adult is the statutory definition of "neglect" in RCW 74.34.020(16)(b), rather than the definition of "child neglect" discussed in *Brown v. Department of Social and Health Services*.[2] In the unpublished portion of this opinion, we reverse the Board's neglect finding because although Woldemicael's mistakes had serious and tragic consequences, they did not rise to the level of statutory neglect of a vulnerable adult. Because two of the Board's licensing violation conclusions depend on its erroneous neglect finding, we reverse those findings. We affirm a third challenged licensing violation that did not depend on the neglect finding, and we remand for the Department to determine appropriate licensing consequences based on the remaining licensing violations. We reject Woldemicael's procedural challenges and deny her request for attorney fees and costs.

FACTS

After Debora's death, Adult Protective Services investigated the Win Home and found that Woldemicael neglected Debora. Woldemicael contested the finding and requested an administrative hearing.

---

[2] 190 Wn. App. 572, 588-93, 360 P.3d 875 (2015).

The ALJ concluded that Woldemicael did not neglect a vulnerable adult. The ALJ held that the definition of "child neglect" in *Brown* also applied to neglect of a vulnerable adult. Under this standard, the Department had to show that Woldemicael acted with reckless disregard, meaning she breached her duty of care and "intentionally acted or failed to act" while "knowing or having reason to know facts that would lead a reasonable person to realize that her conduct created an unreasonable risk of bodily harm to Debora *and* that there was a high degree of probability that substantial harm would result to her." Administrative Record (AR)[3] (APS) at 75. The ALJ determined that Woldemicael did not neglect Debora because she did not "*intentionally* act in a manner that she *knew* would create an unreasonable risk of bodily harm to Debora and that would create a high degree of probability that [Debora] would be substantially harmed." *Id.*

The Department appealed, and the Board reversed the ALJ's decision, rejecting the ALJ's conclusion that the child neglect standard in *Brown* applied to vulnerable adults. The Board determined that the statutory language in RCW 74.34.020(16)(b) required the Department to prove that Woldemicael "committed an act or omission" that "demonstrated a serious disregard of consequences . . . of such a magnitude to constitute a clear and present danger" to Debora's health or safety. AR (APS) at 13. Applying that standard, the Board concluded that Woldemicael neglected Debora.

Woldemicael appealed to the superior court, arguing that the Board should have applied the standard in *Brown*. The superior court affirmed, holding that *Brown* did not apply, that the

---

[3] There are two administrative records. The administrative record in the adult protective services neglect case, Thurston County Superior Court cause no. 18-2-04218-34, is referred to as AR (APS). The adult family home licensing case, Thurston County Superior Court cause no. 18-2-04215-34, is referred to as AR (AFHL).

3

Board did not err when it found Woldemicael had neglected a vulnerable adult, and that Woldemicael's adult family home license should be revoked. Woldemicael appeals.

ANALYSIS

Woldemicael argues that the Board should have adopted the standard articulated in *Brown.* We disagree. *Brown* does not apply to neglect of a vulnerable adult and the proper standard is the statutory definition of "neglect" in RCW 74.34.020(16)(b).

Under RCW 34.05.570(3)(d), we may grant relief from final agency action when "[t]he agency has erroneously interpreted or applied the law." We review such a contention de novo, but we "give substantial weight to [the agency's] interpretation of the law when subjects fall within [the agency's] area of expertise." *Pac. Coast Shredding, LLC v. Port of Vancouver, USA*, 14 Wn. App. 2d 484, 502, 471 P.3d 934 (2020).

RCW 74.34.020(16)(b) defines "neglect of a vulnerable adult" in relevant part as "an act or omission by a person . . . with a duty of care that demonstrates a serious disregard of consequences of such a magnitude as to constitute a clear and present danger to the vulnerable adult's health, welfare, or safety." The statute does not further define "serious disregard" or "clear and present danger."

The statutory definition of "neglect of a child" is nearly identical. *See* RCW 26.44.020(18). In *Brown,* when applying the definition of "neglect of a child," Division Three held that a parent's neglectful conduct must rise above simple negligence. 190 Wn. App. at 593. Under *Brown*, the Department must show not just that a parent failed to act reasonably, but that the parent had a "higher degree of culpability" by taking an action that "involves a high degree of probability" that

the child would be substantially harmed. *Id.* at 590. The court emphasized the "fundamental liberty interest" of a parent "in the care and custody of [their] children." *Id.* at 593.

We agree with Woldemicael that serious disregard requires more than simple negligence, but we reject Woldemicael's contention that the Board erred by failing to employ the *Brown* standard because *Brown* is specific to child neglect cases. The relationship between a parent and a minor child implicates the fundamental right to parent where the relationship between a caregiver and a vulnerable adult does not. Moreover, the Board here never suggested that ordinary negligence supported its neglect finding. Rather, the Board quoted the statutory language and held that Woldemicael's actions constituted a serious disregard of consequences of such a magnitude that it created a clear and present danger. The Board applied the correct statutory standard.

Woldemicael asserts that *Raven v. Department of Social and Health Services*, 177 Wn.2d 804, 822-831, 306 P.3d 920 (2013), extends *Brown* to the vulnerable adult context. We disagree.

*Raven* implicated a different prong of the neglect provision under former RCW 74.34.020(12)(a) (2012), which applies when a person with a duty of care engages in "'a pattern of conduct'" that fails to provide the vulnerable adult with "'the goods and services that maintain physical or mental health . . . or that . . . fails to avoid or prevent physical or mental harm or pain.'" *Id.* at 829 (quoting former RCW 74.34.020(12)(a)). This portion of the statute does not contain the "serious disregard of consequences" or "clear and present danger" language central to the definition of "neglect" applicable in this case. *Id*; *compare* RCW 74.34.020(16)(a), *with* (b). *Raven* is further distinguishable because the appellant in *Raven* was a guardian, not a caregiver, and the court emphasized that the guardian's good faith consideration of the ward's preferences significantly weighed against a neglect finding. *See id.* at 820-21.

Woldemicael also relies on *Crosswhite v. Department of Social and Health Services*, 197 Wn. App. 539, 389 P.3d 731 (2017), but that case is also distinguishable because it dealt with *abuse* of a vulnerable adult under RCW 74.34.020(2), not *neglect* under RCW 74.34.020(16). Unlike the neglect provision, the abuse provision specifies that the Department must show the perpetrator engaged in "'willful action or inaction.'" *Id.* at 550 (quoting RCW 74.34.020(2)).

In sum, the Board did not err by declining to apply *Brown* and instead applying the plain language of the statutory definition of "neglect of a vulnerable adult." The Board properly concluded that, under the statute, the Department needed to establish three elements by a preponderance of the evidence to prove that Woldemicael neglected a vulnerable adult. These elements were: "(1) [Woldemicael] committed an act or omission; (2) the act or omission demonstrated a serious disregard of consequences; and (3) the disregard was of such a magnitude to constitute a clear and present danger to the vulnerable adult's health, welfare, or safety." AR (APS) at 13.

As discussed in the unpublished portion of this opinion, we conclude that even though the Board applied the correct interpretation of neglect under RCW 74.34.020(16)(b) and substantial evidence supported the Board's findings of fact, the Board erroneously applied the law to the facts when it concluded that Woldemicael's conduct rose to the level of neglect. We reverse the Board's neglect finding, reverse the licensing violations that depend on the neglect finding, and remand for further proceedings consistent with the opinion.

A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Unpublished Text Follows

ADDITIONAL FACTS

A.  Woldemicael's Adult Family Homes

Woldemicael, a certified nursing assistant, began operating Samuel's Adult Family Home in 2005. In 2008, Woldemicael purchased a second home, received a second license, and opened a second adult family home named Win Adult Family Home. Between 2008 and 2012, the Department issued seven statements of licensing deficiencies against Woldemicael based on various licensing violations at Samuel's Adult Family Home.

In 2012, the Department brought an action against Woldemicael's license for Samuel's Adult Family Home, alleging that while Woldemicael was out of town and other staff were caring for the residents, one resident was repeatedly physically and verbally abusive to other residents and staff failed to prevent the abuse. The Department alleged other lesser violations including failure to maintain adequate records and failure to ensure adequate staff training, background checks, and tuberculosis screening.

These allegations resulted in a settlement agreement. Woldemicael agreed to relinquish her license for Samuel's Adult Family Home in lieu of revocation, provided that she would retain a valid license for the Win home. However, the terms of the settlement included that the Department would not enter into contracts with Woldemicael for state-funded clients at the Win home. Even so, between 2013 and 2017, the Department continued to contract with Woldemicael for state-funded clients. It is unclear why the Department did not enforce the settlement agreement.

At the Win home, Woldemicael cared for six disabled adults with varying needs. Woldemicael, her husband, nine-year-old daughter, and infant son also lived at the home.

Woldemicael's husband, Michael Kibrom, worked outside the home six days a week from 5:00 a.m. to 3:00 p.m., and he sometimes helped care for the residents after work. Woldemicael employed one additional caregiver who worked nights three or four times per week. During the other nights, Woldemicael set alarms to wake up and assist residents with toileting and other overnight needs.

B.     Debora

Debora was admitted to the Win home in March 2014. She was 63 years old and her diagnoses included seizure disorders and senile psychosis. Kristina Sherriff was Debora's caseworker in 2016. Sherriff conducted an annual assessment of Debora's needs and preferences in November 2016. Sherriff observed Debora and interviewed Woldemicael and Debora's guardian.

Based on that assessment, Sherriff entered responses to about 300 questions about Debora's medical and behavioral needs, ability to complete daily living activities, and the degree of assistance she needed for each activity. Sherriff then created an individual support plan for Debora. In addition to selecting applicable drop-down menu choices, Sherriff wrote custom notes about Debora's needs and instructions for her caregivers.

Debora's individual support plan stated she needed constant monitoring because of her seizures and mobility issues. Her caregiver was required to remain within "[l]ine of sight/[e]arshot (close observation) . . . at all times during awake hours." AR (APS) at 236. Debora could not communicate meaningfully in any way or summon help if in distress.

The individual support plan stated that Debora needed "[e]xtensive assistance" with eating. AR (APS) at 249. Debora could not cut food herself and the plan noted that she had "[p]oor hand

to mouth coordination." *Id.* Debora preferred "small portions" and "like[d] finger food." *Id.* Caregivers needed to "[b]ring food to [Debora]" and "[c]ue [Debora] to feed [her]self, [c]ut food into small pieces, [e]ncourage liquids, [k]eep liquids available, [m]onitor for choking, [p]rovide calm environment, [c]ue throughout meal, [w]ipe mouth as needed." *Id.* Sherriff emphasized, "All foods must be cut into small pieces." *Id.*

In addition to the individual support plan created by the Department, an adult family home must use the Department's assessment "to develop a written negotiated care plan." WAC 388-76-10355. The Department defines a "negotiated care plan" as "the most recent written plan of care describing services to be provided to the [c]lient" based on negotiations between the adult family home provider and the client or client's representative. AR (AFHL) at 448. It must include "[a] list of the care and services to be provided," identify "who will provide the care and services," and specify "[w]hen and how the care and services will be provided." WAC 388-76-10355(1)-(3). It must also include, if needed, "a plan to . . . [f]ollow in case of a foreseeable crisis due to a resident's assessed needs." WAC 388-76-10355(7)(a). "The adult family home must implement each resident's negotiated care plan." WAC 388-76-10365.

Based on Sherriff's assessment and the individual support plan, Woldemicael developed a negotiated care plan for Debora. The negotiated care plan stated that Debora "needs assistance with eating" and the caregiver would "cut her food into small [pieces] and sometimes help her [with] feeding if [Debora] lets caregiver help her." AR (APS) at 630. The negotiated care plan did not include all the details in the individual support plan, including that a caregiver had to cue Debora to eat, encourage liquids, monitor her for choking, and wipe her mouth throughout the meal.

9

Because Debora was aggressive to other residents during meals, she ate dinner before the other residents. Woldemicael often prepared the other residents' meals in the kitchen while Debora ate her dinner at the dining room table.

Photographs in the record show that the kitchen and dining room were adjacent to each other, separated by an open doorway. AR (AFHL) at 224-230. The dining room table was directly in front of the kitchen doorway and a person could easily see the dining room table from the kitchen. *Id.* The photographs also show that a person standing at the kitchen counter was at most a few feet from the dining room table. *Id.*

Woldemicael testified that she did not believe Debora actually needed extensive assistance with eating. According to Woldemicael, Debora only needed a caregiver to prepare the food, cut it up, make sure the table was clean and clear, and let Debora feed herself. Woldemicael did not think it was necessary for "somebody . . . to sit with her and feed her." 1 Verbatim Report of Proceedings (VRP) at 123. Woldemicael also testified that Debora would not eat food that was cut to bite size. Woldemicael further explained that she served foods such as sandwiches cut into quarters because a "[m]anageable" size for Debora was something she could "hold . . . [and] take . . . one bite, or two, or three bites." 1 VRP at 125. Woldemicael testified she had given Debora the same kind of chicken patty sandwich cut into quarters once a week since Debora moved in three years earlier and Debora had never had problems with that meal before.

C.     February 2017 Incident

On February 12, 2017, Woldemicael served Debora dinner at about 4:00 p.m. The meal was a breaded chicken sandwich cut into quarters, chips, and grape juice. Debora sat alone at the dining room table, facing the kitchen. While Debora ate, Woldemicael was in the kitchen doing

dishes and preparing dinner for the other residents. Kibrom was in a different room visiting with guests.

Woldemicael was facing away from Debora for some amount of time. The Board found she may have left Debora unattended for as long as five minutes, but Woldemicael disputes this finding. Woldemicael testified that when she "turned around" Debora's face looked different. 1 VRP at 142.

Woldemicael shouted Debora's name and tapped her shoulder, but Debora was unresponsive. Debora's face was white, her eyes were closed, she had grape juice colored drool coming out of her mouth, and there was some spilled food on her pants. Some of her food was gone. Woldemicael checked her pulse, but found none. The Board found Woldemicael did not look in Debora's mouth or check her airway, but Woldemicael disputes this finding.

Woldemicael called 911 and reported that Debora "'had a . . . seizure where she was eating, and she stopped breathing.'" AR (APS) at 6 (quoting 911 transcript). The record contains a transcript of the 911 call. The 911 operator instructed Woldemicael to place Debora flat on her back and begin CPR immediately. Woldemicael was worried about getting Debora out of the chair alone because of Debora's size. Woldemicael shouted for her husband to come help. After about a minute, Kibrom and his friend moved Debora to the floor.

The 911 operator did not instruct Woldemicael to look in Debora's mouth or to check her airway. The operator instructed Woldemicael to place her hands on Debora's chest to begin CPR compressions. Woldemicael began compressions and continued until emergency responders arrived and took over CPR. Because emergency responders verified Debora had a "Do Not Resuscitate Order," they stopped CPR. AR (APS) at 7.

11

When they stopped CPR, the emergency responders saw food in Debora's mouth. Police officer Alec Dyngen interviewed Woldemicael and Kibrom at the scene. Dyngen wrote in his police report and testified at the hearing that Woldemicael told him she had been in the kitchen for five minutes before turning around and noticing that Debora's face looked strange. Woldemicael and Kibrom also gave written statements to Dyngen.

An autopsy report revealed that Debora choked on food, which blocked her airway, causing death by asphyxiation. The medical examiner found a food bolus consistent with breaded chicken lodged in her throat at the laryngeal inlet. Testimony at the hearing later established that the bolus blocked both the esophagus and the trachea. The bolus measured one and three quarters inch by one and one quarter inch in size. Aspirated food particles were also found in Debora's lungs, suggesting she was coughing shortly before she became unresponsive.

D.    Investigation

Jennifer Witman, a registered nurse complaint investigator for Residential Care Services, began investigating the Win home in February 2017. She entered a statement of deficiencies in March 2017, followed by an order prohibiting admissions to the Win home and summarily suspending and permanently revoking the adult family home license. Adult Protective Services investigator Michelle Rosell investigated whether Woldemicael neglected a vulnerable adult under RCW 74.34.020(16)(b), and then made a finding that neglect was substantiated under the statute. Woldemicael contested both decisions and requested an administrative hearing.

Both Adult Protective Services and Residential Care Services enforcement actions can result in restrictions on adult family home licenses, including permanent license revocation. RCW 70.128.160(2). The consequences of a neglect finding are more severe, however, because under

RCW 74.39A.056(2)-(3), a person found to have neglected a vulnerable adult under chapter 74.34 RCW will be placed on a permanent registry and will not be permitted unsupervised access to vulnerable adults or children in any Department-administered programs and will not be granted a new adult family home license. *See also* WAC 388-76-10120(3)(d)(iii) and [*Department of Social and Health Services (DSHS)*] *Secretary's List of Crimes and Negative Actions for Use by All Programs Administered by DSHS* (Jan. 2020), https://www.dshs.wa.gov/sites/default/files/ bccu/documents/Secretary%E2%80%99sCrimesListforALLPrograms.pdf. It is unclear from this record whether a finding that a person neglected a vulnerable adult is available to and relied upon by entities like school districts and childcare programs when they conduct background checks on potential employees or volunteers, for example.

On July 28, 2017, two days before the hearing was scheduled to begin, Residential Care Services amended the March 2017 statement of deficiencies, adding additional violations, including that Woldemicael failed to comply with the 2013 settlement agreement because she contracted with the Department for state-funded residents in the Win home from 2013 to 2017. The Department reiterated the summary suspension, stop placement, and license revocation order.

E.      ALJ and Board Decisions

On the first day of the administrative hearing, Woldemicael's attorney objected to the recently amended statement of deficiencies and enforcement notice because the Department issued them after discovery had closed. Woldemicael's counsel suggested that the violation stemming from Woldemicael's alleged failure to follow the 2013 settlement agreement should be dismissed.

The ALJ ruled that the amended statement of deficiencies and enforcement notice were proper because administrative procedure rules allow an agency to amend its notice of charges at

any time before or during a hearing, so long as the licensee can continue the hearing if needed. Woldemicael's attorney declined a continuance, asking instead that the Department provide additional discovery on the settlement violation issue. Due to the hearing schedule, there was a two-week gap after the first two days of testimony, and Woldemicael's counsel assured the ALJ that would be enough time for him to address the amended charges. The ALJ reopened discovery as requested.

Testimony at the hearing was consistent with the facts recited above. The ALJ reversed the vulnerable adult neglect finding and the license revocation. As explained above, the ALJ applied the *Brown* standard and determined that Woldemicael did not neglect Debora. The ALJ's determination relied substantially on the testimony of Sherriff, the case manager who conducted Debora's 2016 assessment and created her individual support plan. Because Woldemicael did not "intentionally act in a manner that she knew would create an unreasonable risk of bodily harm to Debora and that would create a high degree of probability that [Debora] would be substantially harmed," the ALJ ruled that Woldemicael did not neglect a vulnerable adult. AR (APS) at 75.

The ALJ also reversed three of the Department's licensing violations (failure to prevent neglect, develop an adequate negotiated care plan, and follow the negotiated care plan) because these licensing violations relied on the neglect finding. The ALJ found Woldemicael did not violate the 2013 settlement agreement because the Department was responsible for offering Woldemicael the contracts. The ALJ concluded that license revocation was inappropriate and remanded for the Department to impose appropriate penalties for the only remaining licensing violations, which were about background checks and continuing education requirements.

The Department appealed, and the Board reversed the ALJ's decision. The Board found Woldemicael neglected Debora by failing to assist her while she ate in violation of her care plans and by failing to check Debora's mouth when Woldemicael found her unresponsive during a meal, which was inconsistent with her training.

The Board also reinstated the Department's licensing violations and license revocation order. The Board found the 2013 settlement agreement was unambiguous and Woldemicael's alleged misunderstanding was not credible, but the Board did not conclude that the violation of the settlement agreement was a separate licensing violation. The Board also found that two former Win home residents, another resident's guardian, and two Department employees thought Woldemicael's quality of care was excellent and did not want the home to be closed. But the Board concluded the Department did not abuse its discretion by revoking her license.

The superior court affirmed the Board's orders. Woldemicael appeals.

ANALYSIS

The Administrative Procedure Act, chapter 34.05 RCW, governs judicial review of final agency actions. Under RCW 34.05.570(1)(a), "The burden of demonstrating the invalidity of agency action is on the party asserting invalidity." And "[t]he challenging party must show that [they have] been substantially prejudiced by the agency action." *Beatty v. Fish & Wildlife Comm'n*, 185 Wn. App. 426, 443, 341 P.3d 291 (2015); RCW 34.05.570(1)(d). There are nine grounds for invalidating an agency action. RCW 34.05.570(3). Woldemicael argues that certain findings of fact were not supported by substantial evidence in the record, that the Board erroneously interpreted or applied the law, that the Department failed to follow prescribed procedures, and that some of the Department's actions were arbitrary and capricious. RCW 34.05.570(3)(c)-(e), (i).

15

## I. SUBSTANTIAL EVIDENCE

A.      Standard of Review and Burden to Show Invalidity of Agency Action

Under RCW 34.05.570(3)(e), we review the Board's factual findings for substantial evidence in light of the whole record. To assess whether substantial evidence supports a challenged factual finding, we ask "whether the record contains evidence sufficient to convince a rational, fair-minded person that the finding is true." *Pac. Coast Shredding*, 14 Wn. App. 2d at 501. "We do not reweigh evidence or judge witness credibility, but instead, defer to the agency's broad discretion in weighing the evidence." *Whidbey Envtl. Action Network v. Growth Mgmt. Hr'gs Bd.*, 14 Wn. App. 2d 514, 526, 471 P.3d 960 (2020). If evidence is disputed, it will nonetheless be substantial if sufficient to persuade a reasonable person of its truth. *See McCleary v. State*, 173 Wn.2d 477, 514, 269 P.3d 227 (2012). Because we generally review only the final agency action, the superior court's findings of fact or conclusions of law are "surplusage." *Morawek v. City of Bonney Lake*, 184 Wn. App. 487, 491, 337 P.3d 1097 (2014).

A reviewing officer in an administrative appeal typically has the same decision-making power as the presiding officer in the initial hearing, but "[i]n reviewing findings of fact by presiding officers, the reviewing officers shall give due regard to the presiding officer's opportunity to observe the witnesses." RCW 34.05.464(4); *see also* WAC 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(1). "[W]e do not accord the deference to the ALJ that we would accord to the trier of fact in a nonadministrative matter." *Crosswhite*, 197 Wn. App. at 548.

Where the reviewing officer's findings contradict the ALJ's, we apply a more searching review to determine whether the deviation was supported by substantial evidence and whether the reviewing judge gave due regard to the ALJ's opportunity to observe the witnesses. *Id.* at 560.

This is especially true where the reviewing officer's findings rest on credibility determinations, which must be specifically identified. RCW 34.05.461(3); *see also Kabbae v. Dep't of Soc. & Health Servs.*, 144 Wn. App. 432, 440-41, 192 P.3d 903 (2008).

Searching review of contradictory factual findings is especially important "where a reviewing officer has rejected 'primary' rather than 'secondary' inferences." *Crosswhite*, 197 Wn. App. at 561. This is because "'[a] primary inference involves a determination of whether a witness' testimony as to an allegedly observed fact is true'" while "'[a] secondary inference involves application of judgment, discretion, or expertise to testimony.'" *Id.* (quoting 2 RICHARD J. PIERCE, JR., ADMINISTRATIVE LAW TREATISE § 11.2, at 979 (5th ed. 2010)). By contrast, an ALJ's factual findings about secondary inferences "'should carry little, if any, weight.'" *Id.* (quoting 2 PIERCE, *supra*, at 992).

B.      Neglect Findings in Adult Protective Services Order

        1.      Finding 14

The Board found Woldemicael "had not cut Debora's food into small pieces." AR (APS) at 5-6. The Board also found that Woldemicael did "not encourag[e] Debora to drink liquids while eating," cue Debora to eat, or "wip[e] Debora's mouth as needed." *Id.* The Board found Woldemicael failed to comply with Debora's individual support plan by not physically assisting Debora during the meal. Additionally, Woldemicael did not "monitor[] Debora for choking" throughout the meal. AR (APS) at 6. The Board's findings regarding these issues were more detailed than the ALJ's, but to the extent they diverge, they do so with regard to secondary inferences. *See Crosswhite*, 197 Wn. App. at 561.

Woldemicael argues these findings were not supported by substantial evidence because some testimony contradicted or undermined them. We disagree.

a.      Size of sandwich pieces

Substantial evidence supported the Board's finding that Woldemicael did not cut Debora's food into small pieces. Sherriff, Witman, and Rosell agreed that "small pieces" meant "bite-sized" pieces. *See* 2 VRP at 77-78; 3 VRP at 189. Woldemicael testified that she served Debora a chicken patty sandwich on a hamburger bun cut into quarters. Woldemicael also said it would have taken Debora one to three bites to finish each quarter. The autopsy report stated, "A pale yellow firm flat 'tongue-shaped' food bolus measuring 1.75 x 1.0 x 0.25 [inches] completely occlude[d]/obstruct[ed] the airway at the [i]nlet of the larynx (above the vocal cords)." AR (AFHL) at 592. Photos of a representative sandwich and the food bolus were also admitted. Rosell and Witman both testified that quartered pieces of a sandwich were not bite-sized pieces.

On the other hand, Sherriff, who conducted the assessment and wrote Debora's individual support plan, testified that in her opinion, a sandwich cut into quarters was "pretty adequate." 2 VRP at 78. Woldemicael testified that Debora had eaten a chicken patty sandwich cut into quarters about once a week for almost three years without choking.

The parties offered contradictory evidence about whether quartered pieces of a sandwich were "bite-sized" pieces small enough to meet Debora's needs, but the evidence was sufficient for a rational fact finder to find that the sandwich was not cut into small pieces. Evidence need not be undisputed to be substantial. *Pac. Coast Shredding*, 14 Wn. App. 2d at 501-02; *McCleary*, 173 Wn.2d at 514. A reasonable fact finder could conclude based on the totality of the evidence that Woldemicael did not cut the sandwich into small pieces.

b.      Physical assistance and monitoring

The Board's finding that Woldemicael did not physically assist Debora while she ate was supported by substantial evidence. There is no evidence in the record that Woldemicael actively encouraged Debora to drink liquids, cued Debora to eat, or wiped her mouth at any point during the meal. Woldemicael and the other witnesses at the house that day agreed that Woldemicael had been in the kitchen preparing meals and doing dishes while Debora ate in the adjacent dining room. Ample evidence supported a rational finding that Woldemicael did not physically assist Debora throughout the meal.

Substantial evidence also supported the Board's finding that Woldemicael did not adequately monitor Debora for choking during the meal. Sherriff testified that a person in the kitchen could see and hear a resident sitting at the dining room table, but Woldemicael spent at least some time turned away from Debora, because she testified that she noticed the strange look on Debora's face "when [she] turned around." 1 VRP at 142. And according to Officer Dyngen's police report and testimony, Woldemicael told him she had been in the kitchen for five minutes before she turned and looked at Debora's face. Evidence at the hearing also established that Woldemicael would have seen Debora's face turning color from red to blue or heard her coughing or vomiting if she had kept Debora in sight or earshot while she ate.

Woldemicael testified she never told Dyngen that she was in the kitchen for five minutes and she said instead that she watched Debora the whole time.

Although there was conflicting testimony, we may not reweigh the Board's conclusions about witness credibility or the weight of evidence, even if we might have reached a different conclusion. *Pac. Coast Shredding*, 14 Wn. App. 2d at 501-02. There is enough evidence in the

record as a whole "to convince a rational, fair-minded person" that Woldemicael failed to either watch or listen to Debora for at least some portion of the meal, long enough for her to choke, cough, and lose consciousness before being noticed. *Id*. at 501. The evidence was sufficient to support a rational finding that Woldemicael did not monitor Debora for choking throughout the meal. We hold that substantial evidence supported the entirety of finding 14.

2.      Finding 6

The Board found that Woldemicael was trained to follow a specific set of steps if she found a resident unresponsive while eating, which included checking the resident's mouth and airway for a food blockage. Woldemicael argues this finding lacked substantial supporting evidence because it ignored contradictory testimony. We disagree.

The ALJ made no finding about Woldemicael's training regarding residents who became unresponsive while eating, so the Board's finding on this issue was implicitly contradictory to the ALJ's. Applying "searching" review, we nonetheless conclude that substantial evidence supported this finding. *See Crosswhite*, 197 Wn. App. at 560.

Priscilla Bunch Baker, who taught CPR/First Aid to caregivers at adult family homes, taught Woldemicael in 2015. Bunch Baker taught caregivers that if a resident became unresponsive while eating, the caregiver should look in the resident's mouth to check for a food blockage and then call 911 and follow the operator's directions. Bunch Baker testified she also taught caregivers how to dislodge food if a resident choked. Bunch Baker said she would have instructed caregivers to take these steps regardless of whether the choking person had a do not resuscitate order because choking can be remedied by removing the blockage. Although Bunch Baker confirmed that a caregiver should immediately call 911 where a resident is unconscious and follow the operator's

instructions, her testimony as a whole was sufficient to support the Board's finding that Woldemicael had been taught to take specific steps if she found a resident unresponsive while eating. We hold that substantial evidence supported finding 6.

### 3. Finding 15

The Board found that "[i]n violation of her training, [Woldemicael] did not look into Debora's mouth, check Debora's airway, or check to see if Debora was breathing." AR (APS) at 6. The ALJ, likewise, found that Woldemicael "did not look in [Debora's] mouth or listen to her chest." AR (APS) at 69. Woldemicael argues this finding was not supported by substantial evidence because she says she *did* check to see if Debora was breathing and the finding ignored testimony of Woldemicael and Bunch Baker that Woldemicael was trained not to put her fingers into Debora's mouth in such a situation because she might have been having a seizure.

Woldemicael testified, however, that she did not look in Debora's mouth when she found her nonresponsive and acknowledged that she did not specifically listen for breathing. Although Bunch Baker testified that she discouraged her students from inserting anything into the mouth of a seizing person, she never testified that a caregiver who suspected a resident might be choking should refrain from looking inside that person's mouth, regardless of whether they could also be having a seizure. Based on the totality of the evidence, the facts support a finding that Woldemicael did not look in Debora's mouth, check her airway, or check whether she was still breathing. We hold that substantial evidence supported finding 15.

### 4. Finding 24

According to this finding, Dyngen testified that Woldemicael "told him she served Debora a meal . . . went to the kitchen, . . . and returned five . . . minutes later and found Debora

unresponsive, with an unusual look on her face." AR (APS) at 7-8. The Board also found that Woldemicael "told . . . Witman that she may have been in the kitchen for five minutes." AR (APS) at 8. The ALJ made these same findings. Woldemicael contends substantial evidence did not support this finding because she "specifically denied making this statement to anyone" and "Witman admittedly derived this information from the police report," not from Woldemicael herself. Appellant's Opening Br. at 35 (emphasis omitted). We agree that substantial evidence did not support part of this finding, but this error was harmless.

When asked what he learned when he interviewed Woldemicael, Dyngen responded, "That she had served . . . Debora a chicken sandwich and . . . then . . . left to go to the kitchen, and returned about five minutes later and saw that . . . Debora had an unusual look on her face." 2 VRP at 18. There is no doubt this finding was supported by substantial evidence because this finding simply reflected the fact that Dyngen made this statement, consistent with his police report.

By contrast, the portion of the Board's finding relating to what Woldemicael allegedly told Witman is not supported by substantial evidence. Witman testified the police report was her only reason for concluding that Woldemicael was in the kitchen for five minutes. There is no evidence that Woldemicael told Witman she was in the kitchen for five minutes.

However, this erroneous portion of this finding was harmless. *See State ex rel. Hunter v. Lowery*, 15 Wn. App. 2d 129, 142, 475 P.3d 505 (2020), *review denied*, 197 Wn.2d 1002 (2021). Dyngen testified to the same information, and his report was arguably more reliable because it was based on the statement Woldemicael allegedly made just minutes after Debora's death. *See* WAC 478-121-253(1).

We hold that all of the challenged findings except finding 24 were supported by substantial evidence in the record. To the extent finding 24 was partially unsupported, the error was harmless. The remaining unchallenged findings are verities on appeal. *Robel v. Roundup Corp.*, 148 Wn.2d 35, 42, 59 P.3d 611 (2002).

C.     Licensing Violation Findings in Residential Care Services Order

    1.     Findings 4, 15, 22, and 27

In these findings, the Board adopted the findings and conclusions in the neglect order. Because we conclude that the findings in the neglect order were supported by substantial evidence except for the partial invalidity regarding Witman's testimony, we adopt the same conclusion with regard to these findings in the licensing order.

    2.     Finding 26

The Board found that Woldemicael said she thought the 2013 settlement agreement "applied only to Samuel's Adult Family Home and did not apply to Win [Adult Family Home]." AR (AFHL) at 7 (emphasis omitted). The Board then found Woldemicael's asserted belief "contrary to the plain language of the agreement and . . . not credible." *Id.* This finding, including the credibility determination, is identical to the ALJ's finding on the same issue. Woldemicael claims this finding was not supported by substantial evidence because "[t]he Board erroneously interpreted the settlement agreement and implicitly concluded that it was unambiguous." Appellant's Opening Br. at 39. We disagree.

"We interpret settlement agreements in the same way we interpret other contracts." *Mut. of Enumclaw Ins. Co. v. USF Ins. Co.*, 164 Wn.2d 411, 424 n.9, 191 P.3d 866 (2008). "A contract provision is ambiguous when its terms are uncertain or when its terms are capable of being

understood as having more than one meaning." *Mayer v. Pierce County Med. Bureau, Inc.*, 80 Wn. App. 416, 421, 909 P.2d 1323 (1995).

The 2013 settlement agreement was not ambiguous. The agreement stated, "The Appellant agrees that the Department will not enter into any new contracts for the purposes of providing care to vulnerable adults or children with Zaid Woldemicael for a period of twenty years following the date of this agreement." AR (APS) at 817. The plain language of the settlement agreement, which was adopted by the ALJ as an order in that case, established that Woldemicael should not have served as the provider in *any* contracts with the Department for 20 years. This prohibition included residents at the Win home.

Woldemicael argues that because the Department contracted with her despite the settlement agreement, the Department "implicitly" conceded that the agreement was ambiguous. Appellant's Opening Br. at 41. She also testified that at the time she signed the settlement agreement, she believed it only applied to Samuel's Adult Family Home and left her free to operate the Win home with no restrictions.

The record shows that Woldemicael's attorney at the time specifically asked if the settlement agreement affected the Win home, and the Department clearly answered that it prohibited Woldemicael from contracting with the Department for any state-funded residents. These communications should have cleared up any confusion about whether Woldemicael could contract with the Department for residents at the Win home. A rational fact finder could conclude that the contract provision in the 2013 settlement agreement was not ambiguous. We hold that substantial evidence supported finding 26.

In sum, the challenged factual findings in the licensing order were supported by substantial evidence in the record except for the minor harmless error regarding Witman's testimony, and the remaining unchallenged findings are verities on appeal. *Robel*, 148 Wn.2d at 42.

## II. INTERPRETATION AND APPLICATION OF THE LAW

A.    Neglect Finding

Woldemicael contends the Board erred by concluding that she neglected Debora based on what she claims were unsupported findings of fact and an erroneous interpretation and application of the statutory definition of "neglect." Woldemicael also argues the Board failed to recognize that a bad outcome alone cannot establish neglect and by ignoring that Debora had eaten sandwiches prepared the same way for the previous three years without incident.

This presents a close question. We conclude that even though the Board applied the correct interpretation of neglect under RCW 74.34.020(16)(b) and substantial evidence supported the Board's findings of fact, the Board erroneously applied the law to the facts when it concluded that Woldemicael's conduct rose to the level of neglect.

Under RCW 74.34.020(16)(b), the Department is required to establish that a person with a duty of care to the vulnerable adult committed "an act or omission . . . that demonstrates a serious disregard of consequences of such a magnitude as to constitute a clear and present danger to the vulnerable adult's health, welfare, or safety." There is no dispute that Woldemicael owed Debora a duty of care. There is also no question that Woldemicael failed to meet Debora's need for assistance during eating as described in the individual support plan and negotiated care plan. Cutting the sandwich into quarters, rather than smaller pieces, and leaving Debora unattended for

five minutes—or at least long enough for Debora to cough, choke, and lose consciousness—were deeply troubling mistakes.

But we must not view the question of whether Woldemicael neglected Debora through the clarity of hindsight. *Brown*, 190 Wn. App. at 596. And a tragic outcome cannot mandate a neglect finding. *See Crosswhite*, 197 Wn. App. at 556. Although Woldemicael should have cut the sandwich into smaller pieces, Debora had handled similarly sized finger food for three years without incident. And photographs of the inside of the home show that the kitchen was only a few steps away from the dining room table. AR (AFHL) at 225-232. Similarly, Sherriff, who visited the home to conduct the assessment, testified that when Woldemicael was in the kitchen, she could have seen and heard a resident sitting at the dining room table. There was no testimony or other evidence at the hearing that Woldemicael was farther away than in the kitchen while Debora ate.

Adina Angle, who worked for the Developmental Disabilities Administration, testified that while Debora's death was truly unfortunate, it is not uncommon for a vulnerable adult to choke while eating, and such an event could occur in all kinds of settings. Multiple people, including other residents, guardians, and Department employees testified more generally at the hearing that Woldemicael was an attentive and effective caregiver.

We also must avoid applying the clarity of hindsight to Woldemicael's failure to check Debora's airway. Substantial evidence supports the Board's finding that Woldemicael was taught to check the airway of a resident found unresponsive while eating, but it is understandable that a person with limited training might forget some first aid protocols in the middle of an emergency without that lapse constituting "a serious disregard of consequences," RCW 74.34.020(16)(b). Woldemicael immediately called 911, and the 911 operator never instructed Woldemicael to check

26

Debora's airway, even though Woldemicael said she thought Debora had a seizure while eating and had stopped breathing.

The Board's findings of fact are supported by substantial evidence, but under the circumstances of this case as a whole, the Board erroneously applied the statutory neglect standard when it concluded that Woldemicael's omissions rose to a level of "serious disregard of consequences" in light of Debora's long history of successfully handling similarly sized sandwich pieces and Woldemicael's physical proximity. RCW 74.34.020(16)(b). Simple negligence is not enough. Standing with her back turned close by in the kitchen for a few minutes while preparing a meal for the other residents does not show serious disregard of consequences.[4]

B.      Licensing Violations

Woldemicael asks us to reverse the Board's conclusions that she violated WAC 388-76-10670 (failure to prevent abuse and neglect), WAC 388-76-10020 (lack of understanding or ability to provide care and services to vulnerable adults), and WAC 388-76-10400(1) (failure to provide care and services identified in the negotiated care plan). We reverse the first two violations and affirm the third.

---

[4] Woldemicael also asserts that the Board erred by referring to the 2012 version of the vulnerable adult neglect statute when the effective version at the time of the hearing was the 2015 version. But to prevail in a challenge to a final agency action, the challenging party must show substantial prejudice. RCW 34.05.570(1)(d). Here, the relevant portions of the 2012 and 2015 versions of RCW 74.34.020 are identical except that the 2015 statute added that the act or omission giving rise to neglect must have been committed by "a person or entity with a duty of care" to the vulnerable adult. Former RCW 74.34.020(15)(b) (2015). No party asserted at any stage below that Woldemicael did not have a duty of care to Debora, and the Board made unchallenged factual findings that Woldemicael was the provider at the Win home and Debora was a resident and a vulnerable adult, which established a duty of care under former WAC 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 (2016), *repealed by* Wash. St. Reg. 21-11-108, *and recodified as* WAC 388-103-0001(13) (effective July 1, 2021). Any error stemming from the Board's reference to an outdated version of the vulnerable adult neglect statute was therefore harmless. *See* RCW 34.05.570(1)(d).

WAC 388-76-10670(2) provides that adult family homes must "[e]nsure each resident's right to be free from . . . neglect," and the administrative rule relies on RCW 74.34.020(16)(b)'s definition of "neglect." *See* WAC 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. The Board indicated that its conclusion about Woldemicael's abilities and understanding rested entirely on its decision that Woldemicael neglected Debora. Consequently, we reverse these violations.

On the other hand, we affirm the Board's conclusion that Woldemicael failed to comply with Debora's negotiated care plan. *See* WAC 388-76-10400(1). In the neglect order, the Board properly found that Woldemicael did not cut Debora's sandwich into small pieces or assist her with eating on the day of her death, even though the negotiated care plan required her to do so. We therefore affirm the Board's conclusion that Woldemicael failed to provide the services identified in Debora's negotiated care plan.

Moreover, the negotiated care plan omitted many details that were in the individual support plan, which stated that Debora needed "extensive assistance" with eating and specified precisely what eating assistance caregivers were to provide. AR (APS) at 236. Because of these omissions, the negotiated care plan was inadequate to meet Debora's specific needs for eating assistance, such as cuing Debora to eat, monitoring her for choking, and wiping her mouth.

Woldemicael's failure to honor and meet the care needs for eating identified in the plans may not have risen to the level of statutory neglect of a vulnerable adult, but the facts amply demonstrate that Woldemicael committed serious violations of the licensing regulations. We affirm the Board's finding that Woldemicael violated WAC 388-76-10400(1)-(2), which requires caregivers in adult family homes to ensure that residents receive "'[t]he care and services identified in the negotiated care plan'" and "'[t]he necessary care and services to help the resident reach the

highest level of physical, mental, and psychosocial well-being.'" AR (AFHL) at 13. Woldemicael failed to meet these requirements and the Board did not err in applying the law to the facts in drawing these conclusions.

We remand for the Department to determine whether the remaining licensing violations require or support the revocation of Woldemicael's license or any other licensing actions.[5]

### III. ALLEGED PROCEDURAL ERRORS

We reject Woldemicael's contention that the Department committed reversible error because neither Adult Protective Services nor the Board determined whether Woldemicael's actions or omissions were a proximate cause of Debora's death. Woldemicael had every opportunity to contest causation at the hearing where her counsel participated fully. And the ALJ and the Board both determined that Woldemicael's actions were a proximate cause of Debora's death after this full hearing.

Nor is Woldemicael entitled to relief because Adult Protective Services violated its policies by not interviewing Woldemicael during the investigation. Witman and Dyngen both interviewed Woldemicael during the investigation, and Woldemicael testified at the hearing. Woldemicael had ample opportunity to share her side of the story, and she has not shown that the hearing would have been different if Rosell had interviewed her. *See* RCW 34.05.570(1)(d).

Woldemicael claims Rosell improperly asked the Lynnwood Police Department to reopen a criminal investigation against her. Woldemicael is not entitled to relief on the basis of this claim

---

[5] Because we reverse the neglect and licensing orders for the reasons above, we need not reach Woldemicael's argument that the orders were reversible because the Department's actions were arbitrary and capricious.

because she presented no evidence that Rosell's communication with the police department prejudiced her in any way. *See* RCW 34.05.570(1)(d).

Finally, we reject Woldemicael's argument that the Department violated due process by introducing an amended statement of deficiencies and enforcement notice shortly before the hearing. The amendments added the allegation that Woldemicael violated the 2013 settlement agreement by continuing to contract with the Department for state-funded residents. The Department complied with WAC 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, which permits an agency to amend its notice of action at any time before or during the hearing, so long as the Department provides written notice and the ALJ permits the parties to postpone the hearing. The Department and the ALJ followed this procedure, and Woldemicael's attorney assured the ALJ he did not need a continuance.

## IV. ATTORNEY FEES AND COSTS

Woldemicael requests attorney fees and costs under the Equal Access to Justice Act (EAJA), RCW 4.84.350. Woldemicael asserts that because the neglect and licensing orders were based on investigations by separate branches of the Department, prevailing on either would make her a substantially prevailing party.

Under the EAJA, "a court shall award a qualified party that prevails in a judicial review of an agency action fees and other expenses, including reasonable attorneys' fees, unless the court finds that the agency action was substantially justified or that circumstances make an award unjust." RCW 4.84.350(1). A "substantially justified" action is one that would satisfy a reasonable person and that had a reasonable basis in law and in fact. *Silverstreak, Inc. v. Dep't of Labor & Indus.*, 159 Wn.2d 868, 892, 154 P.3d 891 (2007). "[I]t need not be correct, only reasonable." *Raven*, 177 Wn.2d at 832.

30

The EAJA contemplates that an agency action may be substantially justified even when the agency's action is ultimately determined to be unfounded. We are wary of awarding fees where there is no determination that the Department's actions were arbitrary, willful, or capricious. For example, in *Raven*, our Supreme Court reversed the superior court's award of attorney fees to the prevailing party where the agency reasonably pursued its enforcement actions. *Id.* at 833. Here, the Department's actions do not appear arbitrary, willful, or capricious, nor was the Department unreasonable in pursuing a finding of neglect or license revocation under the circumstances. We reverse the neglect finding, but conclude that the Department's neglect and licensing actions were substantially justified. We deny Woldemicael's request for attorney fees and costs.

## CONCLUSION

We reverse the Board's neglect finding and the two licensing violations that depend on the neglect finding, but we affirm the third licensing violation. We remand for the Department to determine appropriate consequences for the remaining licensing violations. We deny Woldemicael's request for attorney fees and costs.

Glasgow, A.C.J.

We concur:

Sutton, J.

Veljacic, J.

31