**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

SAM MONTALVO; EVELYN
MONTALVO,
        *Plaintiffs-Appellants,*

        v.

SPIRIT AIRLINES; THE BOEING
COMPANY,
        *Defendants-Appellees.*

No. 05-15640

D.C. No.
CV-03-03181-VRW

MARY BUXTON; JOSEPH BUXTON,
        *Plaintiffs-Appellants,*

        v.

CONTINENTAL AIRLINES INC., a
corporation; THE BOEING COMPANY,
a corporation,
        *Defendants-Appellees.*

No. 05-15703

D.C. No.
CV-03-05634-VRW

DAVID WOODS,
        *Plaintiff-Appellant,*

        v.

AMERICAN AIRLINES, INC.,
        *Defendant-Appellee,*

        and

THE BOEING COMPANY; WEBER
AIRCRAFT LP,
        *Defendants.*

No. 05-15723

D.C. No.
CV-03-05186-VRW

14737

VARUN GUPTA,
              *Plaintiff-Appellant,*

v.

AMERICAN AIRLINES, INC.; THE
BOEING COMPANY,
              *Defendants-Appellees,*
              and
WEBER AIRCRAFT LP,
              *Defendant.*

No. 05-15724
D.C. No.
CV-04-00412-VRW

RICHARD JAFFE; ELLEN JAFFE,
              *Plaintiffs-Appellants,*

v.

EL AL ISRAEL AIRLINES, LIMITED;
AMERICAN AIRLINES, INC.,
              *Defendants-Appellees.*

No. 05-15726
D.C. No.
CV-04-01807-VRW

TERESA STONESTREET,
              *Plaintiff-Appellant,*

v.

AMERICAN AIRLINES, INC., a
Corporation; THE BOEING
COMPANY, a Corporation,
              *Defendants-Appellees.*

No. 05-15732
D.C. No.
CV-03-03845-VRW

BARBARA A. HANSEN,
            *Plaintiff-Appellant,*

v.

AMERICAN AIRLINES, INC.; UNITED
AIR LINES, INC.; UAL
CORPORATION,
            *Defendants-Appellees,*
            and

THE BOEING COMPANY; WEBER
AIRCRAFT LP,
            *Defendants.*

No. 05-15736
D.C. No.
CV-04-00789-VRW

TRUDY HANSCHU; HARRY HANSCHU,
            *Plaintiffs-Appellants,*

v.

AMERICAN AIRLINES, INC., a
Corporation; THE BOEING
COMPANY, a Corporation,
            *Defendants-Appellees.*

No. 05-15746
D.C. No.
CV-03-03849-VRW

JAMES VARRIALE,
            *Plaintiff-Appellant,*

v.

JETBLUE AIRWAYS CORPORATION,
            *Defendant-Appellee.*

No. 05-15889
D.C. No.
CV-04-04166-VRW

ANTHONY R. TWARDOWSKI, an
individual,
                    *Plaintiff-Appellant,*

            v.                                  No. 05-15911

AMERICAN AIRLINES, INC.; AMERICA            D.C. No.
WEST AIRLINES, INC.,                       CV-05-00237-VRW
                    *Defendants-Appellees.*


EDWARD STETSER; RACHEL STETSER,
                    *Plaintiffs-Appellants,*

            v.                                  No. 05-15949

AMERICA WEST AIRLINES, INC., a              D.C. Nos.
corporation; THE BOEING COMPANY,          CV-03-05144-VRW
a corporation,                             MDL-04-1606-
                    *Defendants-Appellees.*        VRW


In re: DEEP VEIN THROMBOSIS
LITIGATION,

_____

RHONDA O. BELL,
                    *Plaintiff-Appellant,*       No. 05-15953

            v.                                  D.C. No.
                                           CV-04-05491-VRW
US AIRWAYS, INC., also known as
US Airways a Subsidiary of US
Airways Group, Inc.; US AIRWAYS
GROUP INC.,
                    *Defendants-Appellees.*

In re: DEEP VEIN THROMBOSIS
LITIGATION,

EUGENE VANARSDALE,
                    *Plaintiff-Appellant,*

                    v.

US AIRWAYS, INC.,
                    *Defendant-Appellee.*

No. 05-15956
D.C. No.
CV-04-01606-VRW

JAMES MOYER,
                    *Plaintiff-Appellant,*

                    v.

US AIRWAYS, INC.,
                    *Defendant-Appellee.*

No. 05-16730
D.C. No.
CV-05-02325-VRW

JAMES H. ENGLISH,
                    *Plaintiff-Appellant,*

                    v.

US AIRWAYS INC.,
                    *Defendant-Appellee.*

No. 05-17180
D.C. No.
CV-05-03180-VRW

THOMAS F. HIND,
          *Plaintiff-Appellant,*

          v.

SOUTHWEST AIRLINES CO.,
          *Defendant-Appellee.*

No. 05-17181

D.C. No.
CV-05-03181-VRW

ORDER AND
AMENDED
OPINION

Appeal from the United States District Court
for the Northern District of California
Vaughn R. Walker, District Judge, Presiding

Argued and Submitted
April 16, 2007—San Francisco, California

Filed October 4, 2007
Amended November 9, 2007

Before: Mary M. Schroeder, Chief Circuit Judge,
Stephen S. Trott, Circuit Judge, and Barry Ted Moskowitz,*
District Judge.

Opinion by Chief Judge Schroeder

---

*The Honorable Barry Ted Moskowitz, U.S. District Judge for the
Southern District of California, sitting by designation.

**COUNSEL**

Randy Baker, Seattle, Washington, and Brenda D. Posada, Sterns & Walker, Oakland, California, for the plaintiffs-appellants.

William J. Boyce, Houston, Texas, for the defendants-appellees.

Clem C. Trischler, Pittsburgh, Pennsylvania, for the defendants-appellees.

Stephen C. Kenney and Samantha D. Hilton, San Francisco, California, for the defendants-appellees.

---

## ORDER

The Opinion filed in this matter on October 4, 2007, is hereby amended to correct a typographical error. The caption is amended to include the case number for Thomas F. Hind v. Southwest Airlines, Case No. 05-17181.

---

## OPINION

SCHROEDER, Chief Circuit Judge:

*I.  Introduction.*

These consolidated appeals arise from fourteen plaintiffs' negligence claims under California common law against various airlines (collectively "the Airlines" or "Airline-Defendants") for failing to warn about the danger of developing deep vein thrombosis and for providing an unsafe seating configuration on domestic flights.

This case presents the question of whether and to what extent the Federal Aviation Act of 1958 (the "FAA"), 49 U.S.C. § 40103, and its corresponding regulations promulgated by the Federal Aviation Administration regarding aviation safety, preempt state law standards of care, including any state-imposed duty to warn about the risks of deep vein thrombosis ("DVT"). We also address whether Plaintiffs may recover for injuries sustained due to an allegedly unsafe seating configuration or whether such claims are preempted by the Airline Deregulation Act of 1978 (the "ADA"), an economic measure designed by Congress to prevent states from regulating airline prices, routes, and services. *See* 49 U.S.C.

§ 41713(b)(1) (previously codified at 49 U.S.C. app. § 1305(a)(1)).

The district court found federal preemption in both instances. It held that the FAA impliedly preempts the field of preflight warnings, and the court dismissed Plaintiffs' failure to warn claim as a matter of law. *In re Deep Vein Thrombosis Litig.*, No. 04-1606, 2005 WL 591241, at *35, *47 (N.D. Cal. March 11, 2005). It observed that Congress' intent in passing the FAA was to preempt the entire field of air safety. It also rested its dismissal on the conflict between federal safety standards governing passenger warnings and any state-imposed duty to warn. The district court further held that the ADA preempts Plaintiffs' unsafe seating configuration claim, because any seating reconfiguration would impermissibly affect airline prices. *Id.*

We affirm the district court's dismissal of the failure to warn claim, but remand the seating configuration claim for further factual development. The FAA and the relevant federal regulations preempt Plaintiffs' failure to warn claim, because the FAA preempts the entire field of aviation safety through implied field preemption. The FAA and regulations promulgated pursuant to it establish complete and thorough safety standards for air travel, which are not subject to supplementation by, or variation among, state laws. Some circuits have considered whether federal law preempts discrete aspects of air safety. *See, e.g. French v. Pan Am Express, Inc.*, 869 F.2d 1, 6-7 (1st Cir. 1989) (holding that the FAA governs issues of pilot suitability, including submission to drug testing). The Third Circuit has gone one step further. *See Abdullah v. American Airlines, Inc.*, 181 F.3d 363, 367-68 (3d Cir. 1999). We adopt the Third Circuit's broad, historical approach to hold that federal law generally establishes the applicable standards of care in the field of aviation safety. *Id.*; *cf. Witty v. Delta Airlines*, 366 F.3d 380, 384-86 (5th Cir. 2004). Because the FAA preempts the entire field of aviation safety from state and territorial regulation, the Airlines are

under no obligation to warn of the risk of developing DVT, absent a federal mandate to do so. Because there are no federal regulations requiring the Airlines to warn about the risks of DVT, we affirm the district court's dismissal of Plaintiffs' failure to warn claim.

The Airlines' preemption argument on the seating configuration claim presents a closer question. The Airlines argue that any reconfiguration of airplane seating would decrease the number of seats and thus require a significant increase in ticket prices to offset the loss in revenue. They assert that triggering this increase would amount to an indirect regulation of airline fares, which is precluded by the ADA. While the Airlines may ultimately be correct, we remand this claim to the district court for further development, because on the basis of the record before us, there is an insufficient factual basis on which to conclude that any seat reconfiguration would have what the Supreme Court has described as the "forbidden significant effect" on airline ticket prices. *See Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 388 (1992).

## II. *Background.*

Plaintiffs filed this suit on April 14, 2003, in state court against Spirit Airlines, Northwest Airlines, El Al Limited, American Airlines, Continental Airlines, America West Airlines, U.S. Airways, and Jetblue Airlines. The facts underlying each of plaintiffs' claims are largely identical. Each plaintiff allegedly developed DVT after taking a transcontinental or mid-continental flight. Each also claims that prolonged, cramped seating during flight was the proximate cause of his DVT. DVT is a medical condition that occurs when a blood clot forms in a deep vein, usually in the leg. It can cause serious complications if the clot breaks off and travels to an organ, most commonly to the lungs or brain. *See Witty*, 366 F.3d at 382. Some of the plaintiffs in this litigation are in fact deceased as a result of the clots spreading to a vital organ.

In their initial complaint, Plaintiffs raised common law personal injury claims against the Airlines, as well as breach of warranty claims against various airplane manufacturers (the "Manufacturer-Defendants"). They claimed that the Airline-Defendants failed to warn about the risk of developing DVT, and that the Airlines failed to inform passengers about steps they could have taken during flight to mitigate any risk. Plaintiffs argued that at the time they took the flights on which they developed DVT, the Airlines were aware or reasonably should have been aware that long-distance air travel can cause DVT and that resulting blood clots can sometimes result in serious injury or death. Plaintiffs asserted that the Airlines were aware of several measures that could prevent passengers from incurring DVT, such as walking around the cabin, exercising the legs while seated, or wearing special stockings. Despite this alleged knowledge, the Airlines gave no warnings regarding DVT.

In addition to the failure to warn claim, Plaintiffs alleged that the Airlines provided an unsafe seating configuration by limiting each passenger's legroom. Apart from the claims against the Airlines, Plaintiffs also brought suit against the Manufacturer-Defendants, claiming they provided a seat design that was defective for the same reason.

Defendants collectively removed the actions to federal district court on the basis of diversity jurisdiction in July 2003. On June 22, 2004, the Judicial Panel on Multidistrict Litigation transferred all actions to Judge Vaughn Walker of the Northern District of California for coordinated pre-trial proceedings. *In re Deep Vein Thrombosis Litig.*, 323 F. Supp. 2d 1378, 1380-81 (J.P.M.L. 2004).

The Manufacturer-Defendants moved for summary judgment on the defective seat design claim, and the district court granted the motion. *Deep Vein Thrombosis Litig.*, No. 04-1606, 2005 WL 591241, *14-15. With respect to the remaining state law claims, the Airline-Defendants filed a Joint

Report and Case Management Statement arguing that federal law preempts the failure to warn and unsafe seating configuration claims. The district court treated the report as a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) and requested briefing from the parties. After considering the arguments, the district court entered judgment for the Airlines under Federal Rule of Civil Procedure 54(b). *Id.* It held that the Airline Deregulation Act expressly preempts the unsafe seating configuration claim, because any required reconfiguration of seats would impermissibly affect prices. *Id.* at *4-10. It also held that the Federal Aviation Act impliedly preempts the failure to warn claim, because Congress intended to occupy exclusively the field of passenger warnings. *Id.* at *10-14.

Plaintiffs pursue on appeal only the district court's dismissal of their failure to warn claim and their unsafe seating configuration claim. They do not appeal the district court's grant of summary judgment in favor of the Manufacturer-Defendants for the defective seat design claim.

## III.   *Preemption of the Failure to Warn Claim.*

**[1]** It is well-established that Congress has the power to preempt state law. U.S. CONST. ART. VI, cl. 2; *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516 (1992). It may do so expressly or impliedly. *Cipollone*, 505 U.S. at 516. Congress' intent may be "explicitly stated in the statute's language or implicitly contained in its structure and purpose." (quoting *Jones v. Rath Packing Co.*, 403 U.S. 519, 525 (1997)) *Id.* Nothing in the FAA expressly preempts state regulation of air safety, so preemption, if any, must be implied.

**[2]** There are two types of implied preemption: conflict preemption and field preemption. Courts may find conflict preemption when a state law actually conflicts with federal law or when a state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of

Congress in enacting the federal law. *See Shaw v. Delta Air-lines, Inc.*, 463 U.S. 85, 95 (1983) (holding that a state law was preempted by ERISA insofar as the state law prohibited practices that were lawful under ERISA); *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000). Implied preemption exists when federal law so thoroughly occupies a legislative field "as to make reasonable the inference that Congress left no room for the States to supplement it." *Cipollone*, 505 U.S. at 516 (citing *Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153 (1982)). Thus, field preemption occurs when Congress indicates in some manner an intent to occupy a given field to the exclusion of state law. *Cipollone*, 505 U.S. at 516. In this case, we conclude that Congress has indicated its intent to occupy the field of aviation safety.

While the comprehensiveness of a statute is one indication of preemptive intent, it alone is generally not sufficient to find that Congress intended to occupy the entire field. *Skysign Int'l Inc. v. Honolulu*, 276 F.3d 1109, 1117 (9th Cir. 2002) (citing *Geier v. American Honda Motor Co.*, 529 U.S. 861, 884 (2000)). We may, however, also look to the pervasiveness of the regulations enacted pursuant to the relevant statute to find preemptive intent. *Fidelity Fed. Sav. & Loan Ass'n*, 458 U.S. at 153 ("Federal regulations have no less preemptive effect than statutes."). This is because "[w]here . . . Congress has entrusted an agency with the task of promulgating regulations to carry out the purposes of a statute, as part of the preemption analysis we must consider whether the regulations evidence a desire to occupy a field completely." *R.J. Reynolds Tobacco Co. v. Durham County*, 479 U.S. 130, 149 (1986) (citation omitted). As a result, a regulation's preemptive force does not depend on express Congressional authorization to displace state law. *Id.* Instead, when an agency administrator promulgates pervasive regulations pursuant to his Congressional authority, we may infer a preemptive intent unless it appears from the underlying statute or its legislative history that Congress would not have sanctioned the preemption. *Id.*

Here, the regulations enacted by the Federal Aviation Administration, read in conjunction with the FAA itself, sufficiently demonstrate an intent to occupy exclusively the entire field of aviation safety and carry out Congress' intent to preempt all state law in this field.

**[3]** We begin with Congress' intent, because our analysis of the scope of the statute's preemption is guided by the oft-repeated comment that the purpose of Congress is the ultimate touchstone in every preemption case. *Id.*; *Cipollone*, 505 U.S. at 516. The Congressional purpose must be clear, for we are mindful of the adage that Congress does not cavalierly preempt state law causes of action. *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996). In this case, however, we are addressing an area of the law that has long been dominated by federal interests. As we have observed, regulation of this country's airspace has "a history of significant federal presence." *Skysign Int'l Inc.*, 276 F.3d at 1116; *Fidelity Fed. Sav. & Loan Ass'n*, 458 U.S. at 153 (holding that preemptive intent is more readily inferred when the statute governs an area of the law where the federal interest is dominant).

The purpose, history, and language of the FAA lead us to conclude that Congress intended to have a single, uniform system for regulating aviation safety. The catalytic events leading to the enactment of the FAA helped generate this intent. The FAA was drafted in response to a series of fatal air crashes between civil and military aircraft operating under separate flight rules. *See United States v. Christensen*, 419 F.2d 1401, 1404 (9th Cir. 1969). To avoid future disasters and, as we have expressed it, "to promote safety in aviation and thereby protect the lives of persons who travel on board aircraft," *In re Mexico City Aircrash of October 31, 1979*, 708 F.2d 400, 406 (9th Cir. 1983), Congress enacted the FAA, "the whole tenor [of which was] to create and enforce one unified system of flight rules." *Christensen*, 419 F.2d at 1404; *see also World Airways, Inc. v. Int'l Brotherhood of Teamsters, Airline Div.*, 578 F.2d 800 (9th Cir. 1978). In discussing

the impetus for the FAA, the Supreme Court has also noted that regulating the aviation industry requires a delicate balance between safety and efficiency. It is precisely because of "the interdependence of these factors" that Congress enacted "a uniform and exclusive system of federal regulation." *City of Burbank v. Lockheed Air Terminal Inc.*, 411 U.S. 624, 638-39 (1973) (citations omitted); *see also id.* at 644 (J. Rehnquist, dissenting) ("The paramount substantive concerns of Congress in enacting the FAA were to regulate federally all aspects of air safety, . . . and, once aircraft were in 'flight,' air-space management . . . ."); *Northwest Airlines, Inc. v. Minnesota*, 322 U.S. 292, 303 (1944) (J. Jackson, concurring) ("Planes do not wander about in the sky like vagrant clouds. They move only by federal permission, subject to federal inspection, in the hands of federally certified personnel and under an intricate system of federal commands.").

**[4]** The legislative history of the FAA further illustrates Congress' intent to make the Federal Aviation Administration the sole arbiter of air safety. The House Report for the FAA explained in a section entitled "Purpose of Legislation," that "the administrator of the new Federal Aviation Agency (1) would be given full responsibility and authority for the . . . promulgation and enforcement of safety regulations . . . ." H.R. REP. NO. 2360, 85th Cong., 2d Sess., 22, *reprinted in* 1958 U.S.C.C.A.N. 3741, 3741. In a letter to the House Committee on Interstate and Foreign Commerce, included as part of the House Report, a representative of the Executive Branch wrote:

> It is essential that one agency of government, and one agency alone, be responsible for issuing safety regulations if we are to have timely and effective guidelines for safety in aviation.

*Id.* at 3761. Congress thus intended to ensure that the agency alone would have the power, if it chose to exercise it, to frame the rules for the safe and efficient use of the nation's airspace.

*Air Line Pilots Ass'n, Int'l v. Quesada*, 276 F.2d 892, 894 (2d Cir. 1960).

**[5]** The language of the Act itself also illustrates that Congress "left open the door" for the Administrator to choose to preempt subfields of air commerce, including but not limited to aviation safety, "through the use of its authority to develop regulations. . . ." *Skysign Int'l Inc.*, 276 F.3d at 1116 (citing 49 U.S.C. § 40103(b)(1)-(2) (1994)). The FAA not only authorizes but affirmatively directs the Administrator of the Federal Aviation Administration to promulgate regulations for the "safe flight of civil aircraft in air commerce." 49 U.S.C. § 44701. Congress also wrote into the FAA a catch-all provision, which directs the Administrator to regulate any "other practices, methods, and procedure the Administrator finds necessary for safety in air commerce and national security." *Id.*

**[6]** Thus, when we look to the historical impetus for the FAA, its legislative history, and the language of the Act, it is clear that Congress intended to invest the Administrator of the Federal Aviation Administration with the authority to enact exclusive air safety standards. Moreover, the Administrator has chosen to exercise this authority by issuing such pervasive regulations that we can infer a preemptive intent to displace all state law on the subject of air safety. *See Fidelity Fed. Sav. & Loan Ass'n*, 458 U.S. at 153. These regulations codified in Title 14 of the Code of Federal Regulations, cover, *inter alia*, airworthiness standards, crew certification and medical standards, and aircraft operating requirements. The regulations also include a general federal standard of care for aircraft operators, requiring that "no person may operate an aircraft in a careless or reckless manner so as to endanger the life or property of another." 14 C.F.R. § 91.13(a) (2003). Most pertinently, a number of specific federal regulations govern the warnings and instructions which must be given to airline passengers. *See* 14 C.F.R. pt. 25 (2005); 14 C.F.R. pt. 121 (2005). These regulations require, for example, that "no

smoking" placards be placed in lavatories, *id.* § 25.791(d) (2004), that "no smoking" signs be illuminated during the entire flight on non-smoking flights, *id.* § 121.317(c) (2003), and that the "fasten seat belt" sign "shall be turned on during any movement on the surface, for each takeoff, for each landing, and at any other time considered necessary by the pilot in command," *id.* § 121.317(b). In addition, the Federal Aviation Administration has published regulations, *id.* §§ 121.571, 121.585, and an advisory circular setting out in detail the oral briefings, familiar to all domestic air travelers, which flight attendants or other flight personnel must give passengers, as well as the information that must be included in passenger safety briefing cards. These briefings include warnings for passenger safety, such as "seat backs [must be] in an upright position before takeoff and landing." *Id.* § 125.327(a)(3). The comprehensiveness of these regulations demonstrates that the Administrator has exercised his authority to regulate aviation safety to the exclusion of the states.

If the FAA did not impliedly preempt state requirements for passenger warnings, each state would be free to require any announcement it wished on all planes arriving in, or departing from, its soil, or to impose liability for the violation of any jury's determination that a standard the jury deems reasonable has been violated. Such a "patchwork of state laws in this airspace . . . would create a crazyquilt effect." *French*, 869 F.2d at 6. Congress could not reasonably have intended an airline on a Providence-to-Baltimore-to-Miami run to be subject to certain requirements in, for example Maryland, but not in Rhode Island or in Florida. *See id.* It is equally as doubtful that Congress would have intended the sufficiency of the Airlines' warnings to hinge on where each passenger on each flight was likely to file suit. As the district court noted, such a result would be an anathema to the FAA. *In re Deep Vein Thrombosis Litig.*, No. 04-1606, 2005 WL 591241, at *13.

The uniqueness of the aviation industry further mandates the need for a centralized authority. *See, e.g.*, S. Rep. No.

1811, 85th Cong., 2d Sess. 5 (1958) ("Aviation is unique among transportation industries in its relation to the federal government—it is the only one whose operations are conducted almost wholly within federal jurisdiction, and are subject to little or no regulation by States or local authorities."). Aviation transportation requires more national coordination than any other public transportation and also poses the largest risks. *Id.* Regulation on a national basis is required because air transportation is a national operation.

For all of these reasons, the Third Circuit became the leading circuit to recognize that federal law preempts the entire field of aviation safety. *Abdullah*, 181 F.3d at 367-68. The plaintiffs in that case were passengers who were injured when an airline encountered turbulence. They sued the airline for negligence for failing to warn the passengers about the turbulence. In determining whether the plaintiffs' claims were preempted, the Third Circuit concluded that "because of the need for one, consistent means of regulating aviation safety, the standard applied in determining if there has been careless or reckless operation of an aircraft, should be federal; state or territorial regulation is preempted." *Id.* at 372. The plaintiffs could therefore recover only if they could prove that the airlines violated a federal standard of care. *Id.*

**[7]** We similarly hold that federal law occupies the entire field of aviation safety. Congress' intent to displace state law is implicit in the pervasiveness of the federal regulations, the dominance of the federal interest in this area, and the legislative goal of establishing a single, uniform system of control over air safety. This holding is fully consistent with our decision in *Skysign*, 276 F.3d 1109, where we considered whether federal law preempted state regulation of aerial advertising that was distracting and potentially dangerous to persons on the ground. In upholding the state regulations, we held that federal law has not "preempt[ed] altogether any state regulation purporting to reach into the navigable airspace." *Id.* at 1116. While Congress may not have acted to occupy exclu-

sively all of air commerce, it has clearly indicated its intent to be the sole regulator of aviation safety.

**[8]** The FAA, together with federal air safety regulations, establish complete and thorough safety standards for interstate and international air transportation that are not subject to supplementation by, or variation among, states. The district court correctly held that because there is no federal requirement that airlines warn passengers about the risk of developing DVT, Plaintiffs' negligence claim fails as a matter of law.

*IV.   Preemption of the Unsafe Seating Configuration Claim.*

Plaintiffs' second claim is that the Airlines were negligent in providing an unsafe seating configuration, which caused blood clots to form in Plaintiffs' bodies from a lack of adequate legroom. The district court dismissed the claim under Federal Rule of Civil Procedure 54(b), holding that it was preempted by the Airline Deregulation Act, 49 U.S.C. § 41713(b)(1). *In re Deep Vein Thrombosis Litig.*, No. 04-1606, 2005 WL 591241, at *4-8. The court accepted the position of the Airlines, who posited that to provide more legroom, they would have to reduce the number of seats per aircraft and then materially increase ticket prices to offset the decreased revenue. The court found that there would be a price increase and it would amount to a forbidden indirect regulation of the aviation industry under the ADA. *Id.* at *8-10.

**[9]** The ADA, unlike the FAA, contains an express preemption provision. *See* 49 U.S.C. § 41713(b)(1). It prohibits states from indirectly regulating air commerce by enacting laws that have a significant effect on airline prices, routes, or services. *Id.* Preemption provisions are narrowly and strictly construed. *Charas v. Trans World Airlines, Inc.*, 160 F.3d 1259, 1265 (9th Cir. 1998). In deciding whether the ADA expressly preempts Plaintiffs' claim, we must first "ascertain and give effect to the plain meaning of the language used." *Id.* at 1264

(quoting *Hughes Air Corp. v. Public Utils. Comm'n*, 644 F.2d 1334, 1337 (9th Cir. 1981)). We may then "look to the provisions of the whole law[ ] and to its object and policy." *Id.* (quoting *Kelly v. Robinson*, 479 U.S. 36, 43 (1986)). And, as always, we must keep in mind that Congress' intent is the ultimate touchstone of every preemption case. *Id.* at 1265.

Congress enacted the ADA in 1978 as an amendment to the FAA. The Act's purpose was to encourage airlines to compete in the marketplace by deregulating the aviation industry. *Morales*, 504 U.S. at 378. Before deregulation, Congress had authorized the Civil Aeronautics Board to regulate entry into the interstate airline industry, set routes that airlines could fly, and choose rates that the airlines could charge consumers. *Id.* Congress terminated this practice to encourage the airlines to be more autonomous competitors in our capitalist society.

Congress feared, however, that states would attempt to undo federal deregulation with regulation of their own. *Id.*; *see also Charas*, 160 F.3d at 1265. To prevent states from doing indirectly what Congress proscribed directly, Congress included an express preemption provision in the ADA. The provision provides, subject to certain exceptions not relevant here, that:

> A State . . . may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of any air carrier that may provide air transportation under this subpart.

49 U.S.C. § 41713(b)(1).

The Supreme Court has twice addressed the scope of this preemption clause, first in *Morales*, 504 U.S. 374, and again in *American Airlines v. Wolens*, 513 U.S. 219 (1995). The Court in *Morales* held that the ADA preempted the attempts of several state attorneys general to enforce state laws prohib-

iting deceptive advertising by airlines, because advertising fostered competition, which in turn affected airline prices. In so holding, the Court paid particular attention to the use of the phrase "related to." The Court interpreted the phrase to mean any state regulation "having a connection with, or reference to, airline 'rates, routes, or services.' " *Morales*, 504 U.S. at 384. The Court, however, was careful to limit the reach of the preemptive effect to regulation that has some long-term material impact. It emphasized that only those regulations that have "the forbidden significant effect" upon rates, routes, or services are preempted. *Id.* at 388.

We have applied *Morales* and *Wolens* to an ADA preemption case in order to address whether certain state tort claims that related to the negligent performance of in-flight duties by flight attendants were preempted. *See Charas*, 160 F.3d 1259. We noted that the Supreme Court has held preempted only state regulation that has a significant effect on prices, routes, and services, because Congress' intent in deregulating the aviation industry was to "encourage the forces of competition," not to obviate all tort claims under state law that might in some peripheral way impact the airlines. *See id.* at 1266. We held that state claims that do not "significantly impact federal deregulation" are not preempted. *Id.* at 1265-66. Clarifying some confusion in our cases, we held that preemption of regulation related to "services" refers to the regularity or frequency of flights between given destinations, not to the onboard services rendered by a flight crew.

In *Witty*, 366 F.3d 380, which presented the same legal issues before us now, the Fifth Circuit dismissed the plaintiffs' seating configuration claim on preemption grounds, observing that the plaintiffs effectively conceded that any seat reconfiguration would materially affect costs, leading to a significant increase in airfares. *Id.* at 383. In this case, however, Plaintiffs have not conceded that any seating reconfiguration would result in a significant effect on airline ticket prices or would interfere with the forces of competition. The Airlines

have not yet produced any evidence on this issue, and we have no factual basis on which to judge the effect of any seating reconfiguration on prices. We thus cannot determine whether a seat reconfiguration would materially impact federal deregulation, which this court has determined is a prerequisite for finding preemption. *See Charas*, 160 F.3d at 1265-66.

**[10]** The Supreme Court has instructed that only those state laws that have a significant effect on prices are preempted by the ADA. *Morales*, 504 U.S. at 384. Without more factual development, we cannot determine whether the preemptive reach of *Morales* extends as far as the seating configuration issue presented in this case. We therefore remand the reconfiguration claim to the district court for further proceedings.

*V.   Conclusion.*

**[11]** We hold that Plaintiffs' failure to warn claim is preempted by the Federal Aviation Act, which together with the regulations promulgated by the Federal Aviation Administration, exclusively governs the entire field of aviation safety. We thus affirm the district court's judgment in favor of the Airlines on this claim. The judgment in favor of the Airlines on the seating configuration claim is reversed, and that claim is remanded for further factual development, because on the basis of the record before us, we are unable to determine to what extent seat reconfiguration would affect airline prices. Each party shall bear its own costs.

AFFIRMED IN PART; REVERSED AND REMANDED IN PART.