IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| THOMAS D. RAY,<br><br>               Respondent,<br>     v.<br><br>VINCENT DAVIS DITMORE,<br><br>               Appellant. | No. 81494-0-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

CHUN, J. — Thomas Ray brought a negligence suit against Vincent Ditmore, claiming damages arising from a ground collision between their airplanes. After a bench trial, the trial court determined that Ditmore was solely responsible for the collision. Ditmore appeals, claiming Ray's negligence was the sole cause of, or at least contributed to, the collision. For the reasons below, we affirm.

## I. BACKGROUND

### A. Facts

The Arlington Municipal Airport is an "uncontrolled" airport because it does not have an air traffic control tower. Federal Aviation Administration Advisory Circular (AC) 90-66A § 4(a). Pilots communicate with each other using a Common Traffic Advisory Frequency (CTAF), which is a radio "frequency designated for the purpose of carrying out airport advisory practices while operating to or from an airport without an operational control tower." Aeronautical Information Manual (AIM) § 4-1-9(b)(1).

Citations and pin cites are based on the Westlaw online version of the cited material.

Ellie's at the Airport is a restaurant just east of Taxiway A. It has large windows from which diners can watch airplane traffic. Many pilots fly to the airport, park their planes on the East Ramp—which is just east of Taxiway A and directly south of Ellie's—and dine at the restaurant.

September 15, 2017 was a clear day with excellent visibility. Ray flew his Piper PA-18 Super Cub (Cub) to the airport. The Cub is a fixed-wing plane from which the pilot has full visibility from the front and the sides. Once Ray landed, he turned off his radio and anti-collision lights. He taxied towards Arlington Flight Services' (AFS) self-service fuel station at the north end of the airport, and planned to have lunch at Ellie's.

Ditmore was also at the airport where his Boeing Stearman biplane was undergoing repairs. The body of the Stearman rests at an angle with the nose of the plane higher than the tail. The cockpit angles upward facing the nose of the plane. As a result, when taxiing in a straight line, the pilot cannot see over the nose, in front of the plane. Like driving "a car with the hood up," the nose obscures the pilot's vision. To avoid taxiing "blindly," Stearman pilots taxi in an S pattern, known as "s-turns" or "s-turning." As the pilot steers the plane to the left, they look to the right side of the plane to see oncoming traffic. As the pilot steers to the right, they look to the left side.

Ray refueled his Cub, maneuvered it onto Taxiway A, and began traveling south towards Ellie's. Simultaneously, Ditmore travelled north on Taxiway A. Ditmore turned off Taxiway A and onto the East Ramp as Ray continued taxiing south on Taxiway A. Then, Ditmore reentered Taxiway A directly in front of Ray.

2

Ray slowed down and tried to swerve to avoid Ditmore, but the planes collided. The "left wing tip of the Super Cub caught on the end strut" of the Stearman. Because the "Stearman weighs twice as much" as the Cub, the force of the collision lifted the Cub and spun it 180 degrees. It sustained extensive damage and was no longer airworthy.

B. Procedural History

Ray sued Ditmore for negligence. Ditmore countersued for negligence. The matter proceeded to a bench trial.

Mark Hilsen witnessed the collision and testified to the following: He was having lunch at Ellie's and watching the airport traffic through the windows. He saw the Cub taxiing south and the Stearman taxiing north on Taxiway A. The Stearman was taxiing straight, not s-turning. The trial court found Hilsen credible and afforded his testimony "great weight."

Ray testified to the following: While taxiing south on Taxiway A from AFS, he did not have his anti-collision lights or radio on. He saw the Stearman taxiing north and Ditmore was not s-turning. He saw Ditmore "straddling the line" between Taxiway A and the East Ramp. When Ditmore got to the north end of the East Ramp, he navigated back onto Taxiway A going north in Ray's direction. Ray did not know what Ditmore was doing, so he "slowed down way before he got close" and "started moving to the right . . . as far as I could." "[A]s [Ditmore] got closer to the end of the ramp, there was enough of an angle that it became obvious that if I didn't take drastic action to avoid him, that he was going to

3

collide with my airplane." Ray tried to avoid the collision by swerving. After the collision, Ditmore walked over to Ray and said that he did not see the Cub.

Ditmore's testimony contradicted Hilsen's and Ray's versions of the incident. He testified to the following: "When I came up initially, I did not [see the Cub]. I was not looking that far ahead." Before he entered Taxiway A, he saw the Cub at AFS. He planned to refuel where Ray had refueled. Ditmore used his radio to announce his intentions to taxi north on Taxiway A to other pilots and AFS. He assumed the Cub was parked because its "rotating beacon" or "anti[-]collision" lights were off and he did not get a radio response. Ditmore entered Taxiway A and s-turned as he taxied north on Taxiway A. He was halfway through his fifth s-turn, and he could not see the Cub, when the planes collided.

The trial court found that Ditmore failed to explain why he did not see the Cub on the taxiway while he s-turned "a distance of over [two] football fields." The court wrote that it "looked carefully at Mr. Ditmore's explanation for how the accident happened, assessed it against other evidence, and concludes that much of Mr. Ditmore's explanation is unsupported by the evidence and is therefore unreliable." The trial court concluded that Ditmore was solely responsible for the collision because he failed to s-turn and thereby failed to "use ordinary care to see what was in front of him and his speed and [sic] are the sole proximate causes of the collision." It entered judgment against Ditmore and awarded Ray $84,047.65 in damages plus statutory costs and attorney fees. Ditmore appeals.

4

## II. ANALYSIS

### A. Negligence Per Se

Ditmore suggests that Ray's non-compliance with Federal Aviation Regulations (FARs), and certain provisions of the AIM and certain ACs, constitutes negligence per se.[1] He says the court should have found "negligence as a matter of law" because Ray failed to: (1) illuminate his anti-collision lights; (2) monitor his radio while taxiing; (3) see and avoid the collision; (4) keep proper distance; (5) follow taxi procedures; and (6) maintain a current medical certification.

Under traditional negligence per se doctrine, "the violation of a statute or administrative regulation establishes the elements of duty and breach." Williams v. Leone & Keeble, Inc., 170 Wn. App. 696, 718, 285 P.3d 906 (2012). But with few exceptions not at issue here, in 1986, our legislature abolished the doctrine. RCW 5.40.050 ("a breach of a duty imposed by statute, ordinance or

---

[1] On a related note, Ditmore says that "[s]tate tort *remedies*, like this action for property damage, are not preempted, but the *standard of care* that applies to such tort actions is defined exclusively by federal rules, regulations, and statutes." He contends the FARs and AIM govern a pilot's reasonable duty of care and preempt the state's common law standard of care. Ditmore raises this argument for the first time on appeal and we need not address it. RAP 2.5(a) ("The appellate court may refuse to review any claim of error which was not raised in the trial court.").

Also, in advancing this theory, Ditmore relies on the Ninth Circuit's opinion in Montalvo v. Spirit Airlines, which states, "The FAA, together with federal air safety regulations, establish complete and thorough safety standards for interstate and international air transportation that are not subject to supplementation by, or variation among, states." 508 F.3d 464, 473–74 (9th Cir. 2007). But the Ninth Circuit's opinion in Martin ex rel. Heckman v. Midwest Express Holdings, Inc. clarified Montalvo: "[W]hen the agency issues 'pervasive regulations' in an area, like passenger warnings, the FAA preempts all state law claims in that area. In areas without pervasive regulations or other grounds for preemption, the state standard of care remains applicable." 555 F.3d 806, 811 (9th Cir. 2009). Ditmore does not show that there are such pervasive regulations in the context of this case.

administrative rule shall not be considered negligence per se but may be considered by the trier of fact as evidence of negligence"); Pettit v. Dwoskin, 116 Wn. App. 466, 472, 68 P.3d 1088 (2003) (under the doctrine, "the duty imposed was absolute, and the question of actual negligence was irrelevant. But the doctrine of negligence per se is no longer viable in Washington. Rather, violation of a legal requirement is evidence of negligence."). In suggesting that the doctrine applies, Ditmore relies on cases that predate the doctrine's abolition and do not apply.[2]

Given the foregoing, negligence per se does not apply.

B. Negligence & Contributory Negligence

Ditmore contends that the FARs and certain federal guidelines set forth the standards of care in this matter. He asserts that the trial court misunderstood these standards. Ditmore also contends the court erred in failing to attribute sole, or at least some, responsibility for the collision to Ray. He says that but for Ray's failure to illuminate his anti-collision lights, monitor his radio while taxiing, see and avoid the collision, keep proper distance, follow taxi procedures, and maintain a current medical certification, the collision would not have occurred. Because the trial court did not commit legal error, substantial evidence supports

---

[2] See, e.g., Rathvon v. Columbia Pac. Airlines, 30 Wn. App. 193, 207, 633 P.2d 122 (1981) ("We have no difficulty with the concept of holding that violations of the [FARs], like violations of any other regulations, *may* constitute negligence per se, under appropriate circumstances.") (emphasis added); Mills v. Orcas Power & Light Co., 56 Wn.2d 807, 820–21, 355 P.2d 781 (1960) (considering the duty of care a power company that maintained power lines next to an active airport owed to planes midflight and whether the common law duties of care for trespassers, licensees, and invitees apply to planes); Baker v. United States, 417 F. Supp. 471 (W.D. Wash. 1975) (considering the Federal Torts Claims Act, 28 U.S.C., § 1346 et seq.).

the trial court's findings, and those findings support its conclusion that Ditmore solely caused the collision, we affirm.

In Crosby v. Cox Aircraft Company of Washington, our Supreme Court held that general principles of negligence control questions of aircraft owner and operator liability for ground damage. 109 Wn.2d 581, 583, 589–90, 746 P.2d 1198 (1987) ("[O]wners and operators of flying aircraft are liable for ground damage caused by such aircraft only upon a showing of negligence."). The court explained, "The causes of aircraft accidents are legion and can come from a myriad of sources. . . . In such circumstances the imposition of liability should be upon the blameworthy party who can be shown to be at fault." Id. at 588.

To recover on a claim of negligence, an injured party must show (1) the existence of a duty, (2) breach of that duty, (3) resulting injury, and (4) the breach as the proximate cause of that injury. Johnson v. Liquor & Cannabis Bd., 197 Wn.2d 605, 611, 486 P.3d 125 (2021). The existence of a legal duty in a negligence case is a legal question we review de novo. C.L. v. Dep't of Soc. & Health Servs., 200 Wn. App. 189, 196, 402 P.3d 346 (2017).

Proximate cause has two elements: cause in fact and legal causation. M.E. through McKasy v. City of Tacoma, 15 Wn. App. 2d 21, 33, 471 P.3d 950 (2020). "Cause in fact, or 'but for' causation, refers to the 'physical connection between an act and an injury.' The plaintiff 'must establish that the harm suffered would not have occurred but for an act or omission of the defendant.'" Martini v. Post, 178 Wn. App. 154, 164, 313 P.3d 473 (2013) (citation omitted) (quoting Hartley v. State, 103 Wn.2d 768, 779, 698 P.2d 77 (1985); Joyce v. Dep't of

7

Corr., 155 Wn.2d 36, 322, 119 P.3d 825 (2005)).  Cause in fact is normally a question of fact for the trier of fact.  Meyers v. Ferndale Sch. Dist., 197 Wn.2d 281, 289, 481 P.3d 1084 (2021).  Legal causation "involves a policy determination as to how far the consequences of an act should extend and is generally a legal question."  M.E., 15 Wn. App. 2d at 33.

Under RCW 4.22.070, with some exceptions not applicable here, "[i]n all actions involving fault of more than one entity, the trier of fact shall determine the percentage of the total fault which is attributable to every entity which caused the claimant's damages."

We review a trial court's factual findings for substantial evidence, "asking whether the record contains evidence sufficient to convince a rational, fair-minded person that the finding is true."  Pacific Coast Shredding L.L.C. v. Port of Vancouver, USA, 14 Wn. App. 2d 484, 501, 471 P.3d 934 (2020).  "'There is a presumption in favor of the trial court's findings.'"  Andren v. Drake, 14 Wn. App. 2d 296, 306, 472 P.3d 1013 (2020) (quoting State v. Merrill, 183 Wn. App. 749, 755, 335 P.3d 444 (2014)).  The burden of showing that a finding of fact is unsupported by substantial evidence rests with the party claiming error.  State v. Lowery, 15 Wn. App. 2d 129, 138, 475 P.3d 505 (2020).  Following a bench trial, we review de novo a trial court's conclusions of law.  Rufin v. City of Seattle, 199 Wn. App. 348, 355, 398 P.3d 1237 (2017); Ensberg v. Nelson, 178 Wn. App. 879, 886, 320 P.3d 97 (2013).

1. Anti-Collision Lights

Ditmore contends that the trial court should have determined that Ray's breach of the duty to illuminate the Cub's anti-collision lights caused or contributed to the collision.[3]

The trial court determined that Ray breached the standard of care by not illuminating the lights, but that the breach was not the proximate cause of the collision:

> Dr. Ray had wing lights on his Piper Cub. He did not turn them on when he started his engine, which was a breach of the standard of care. However, because the day was a bright, sunny day, and because Dr. Ray and Mr. Ditmore both had unobstructed views of each other for 4500' along Taxiway A, and there were no other aircraft or other distractions to obscure Dr. Ray's airplane from Mr. Ditmore's view, Dr. Ray's failure to turn on the lights is *not* a legal proximate cause of the collision. Had Mr. Ditmore fulfilled his duty to see what could be seen by an ordinary person, the collision would not have occurred.

(Emphasis added.)

The trial court found that Ditmore was taxiing straight rather than s-turning. Hilsen and Ray testified that Ditmore was not making s-turns, so he could not see in front of the Stearman. Ray testified that because Ditmore could not see over the nose of the Stearman, "[h]e would have been unable to see if I had

---

[3] Ditmore assigns error to finding of fact 16, which states, "Dr. Ray's Piper Cub was equipped with wing lights that were operational, but Dr. Ray did not have them on at any time relevant to these proceedings." Ditmore says the issue involved Ray's "rotating red beacon" lights, not "wing lights." Ray did not dispute that his beacon lights were off. And he responds that "[i]t is clear from the testimony and argument at trial, however, the only lights the trial court could reasonably be referring to were [my] rotating, anti-collision light/beacon." At trial, no one used the term "wing lights." Instead, witnesses testified only about "beacon lights," "anti-collision lights," and "strobe lights." There was a consensus that beacon lights and anti-collisions lights are the same thing, but strobe lights are different. While the terminology is different, substantial evidence supports the trial court's findings that the Cub had working beacon lights on its wings and that those lights were not illuminated.

lights or not." Because Ditmore's own plane obstructed his view, the lights would have done little, if anything, to make the Cub more visible to Ditmore. Thus, substantial evidence supports the trial court's findings that Ditmore's own plane obstructed his view, and that finding supports its determination that but for Ditmore's failure to see, the collision would not have occurred.

    2. Radio Communication

Ditmore assigns error to finding of fact 36, specifically challenging the statement that "[p]ilots are discouraged from using radios when they are on the ground because it can interfere with the needs of pilots who are airborne." Ditmore also contends the trial court should have determined that Ray owed him a duty to monitor his radio under AIM § 4-1-9(g)(1)-(2) and AC 90-66B § 10.1.1.5.[4] He contends that Ray's failure to monitor the radio caused or contributed to the collision.

Substantial evidence supports finding of fact 36. Ditmore testified that when he radioed his intent, AFS responded, "I have not heard that in a long time." He testified that he understood AFS's response to mean, "[T]here is not a lot of people really adhering to protocol, ground operation protocol at the Arlington Airport." AFS's response indicates that it is not local procedure for pilots to announce their intent to taxi over the radio. That response also tracks

---

[4] AC 90-66B postdates the collision. It replaced AC 90-66A (1993) and AC 90-42F (1990), which were in effect at the time of the incident, and which we consider here. The ACs' practices and procedures supplement the AIM. AC 90-42F § 5(a) ("In the Interest of promoting safety, the Federal Aviation Administration, through its Airman's Information Manual, Airport Facility Directory, Advisory Circular, and other publications provides frequency information, good operating practices, and procedures for pilots to use when operating to and from an airport without an operating control tower.").

Ray's testimony and understanding that "federal an [sic] air regulations now discourage communication on the ground, because they want that frequency to be available for airplanes that are in the air or in the process of taking off or landing." The foregoing constitutes substantial evidence supporting the finding.

Next, we consider Ditmore's contention that even if ground communication is discouraged, the court should have determined that Ray owed him a duty to monitor his radio even while on the ground under three provisions of AIM § 4-1-9.

First, Ditmore cites the part of AIM § 4-1-9(a)(1) that states, "To achieve the greatest degree of safety, it is essential that all radio-equipped aircraft transmit/receive on a common frequency identified tor the purpose of airport advisories." But this focuses on the importance of using a common frequency versus monitoring the radio. AIM § 4-1-9(a)(1) also states,

> There is no substitute for alertness while in the vicinity of an airport. It is essential that pilots be alert and look for other traffic and exchange traffic information when approaching or departing an airport without an operating control tower. This is of particular importance since other aircraft may not have communication capability or, in some cases, pilots may not communicate their presence or intentions when operating into or out of such airports.

This part of AIM § 4-1-9(a)(1) focuses on being alert, looking for other traffic, and exchanging information as not all pilots will have communication capability or announce their presence or intent. Its terms do not impose a duty to monitor the radio; and it acknowledges that some aircraft may not have communication capability. And as discussed above, here, substantial evidence supports the finding that pilots were discouraged from using the radio while on the ground. Likewise, as discussed below, Hilsen understood that AIM was merely advisory.

Second, Ditmore cites AIM § 4-1-9(c)(1) for the proposition that "all pilots are required to 'monitor/communicate' on the appropriate frequency when operating aircraft at or near a noncontrolled airport." But this misconstrues AIM § 4-1-9(c)(1), which states in pertinent part that "[p]ilots of inbound traffic should monitor and communicate as appropriate on the designated CTAF from 10 miles to landing." Ray had his radio on while he was inbound, and turned it off when he landed. To the extent that AIM § 4-1-9(c)(1) establishes a duty to monitor the radio, Ray did not breach the duty by turning the radio off after he landed.

Third, Ditmore cites AIM § 4-1-9(g)(1)-(2), which provide that pilots should "self-announce" their "position or intended flight activity or ground operation on the designated CTAF" at airports without a flight service station and operating air control tower. While AIM § 4-1-9(g)(1)-(2) instruct pilots to use self-announce procedures, it does not impose a duty to monitor the radio.

To the extent that AIM § 4-1-9 establishes a duty to monitor the radio, Ditmore has not shown how Ray breached the duty by turning the radio off after he landed.[5]

---

[5] Notably, Hilsen testified as to his understanding that AIM is "advisory not regulatory," suggesting that it is customary for pilots at the Arlington Municipal Airport use the AIM as non-binding guidance. And we recognize that courts may look to common customs and practices to determine the standard of care. See, e.g., Helling v. Carey, 83 Wn.2d 514, 518–19, 519 P.2d 981 (1974) (determining industry standard based on common custom in ophthalmology); RESTATEMENT (SECOND) OF TORTS § 295A (1965) ("In determining whether conduct is negligent, the customs of the community, or of others under like circumstances, are factors to be taken into account, but are not controlling where a reasonable man would not follow them.").

3. See & Avoid

Ditmore contends that the trial court erred in making a number of findings of fact about Ditmore's speed and Ray's ability to see and avoid Ditmore. He also contends that the trial court applied the wrong standard of care and erred by not concluding that Ray owed him a duty to "see and avoid" under 14 C.F.R. § 91.113(b) and (e), breached that duty, and caused or contributed to the collision.

First, Ditmore assigns error to findings of fact 20, 21, 22, 23, and 24, which state:

> 20. Mr. Ditmore taxied the Stea[r]man north on Taxiway A at a higher rate of speed and did not make S turns.
>
> 21. As Mr. Ditmore's plane approached the East Ramp, it began to straddle the line between the East Ramp area and the taxiway.
>
> 22. Dr. Ray knew that the Stearman would eventually either need to stop in the East Ramp or return to the taxiway because there is a ditch at the north end of the East Ramp. Consequently, Dr. Ray slowed further and moved his plane to the west (away from Mr. Ditmore's possible pathway), in an effort to understand and anticipate Mr. Ditmore's actions.
>
> 23. As Mr[.] Ditmore approached the end of the ramp, he did not stop. He suddenly turned the plane 30 to 40 degrees to the west, placing him on an immediate collision course with Dr. Ray's Piper Cub.
>
> 24. Dr. Ray attempted to avoid the collision by also turning his plane sharply west.

When a trial court has weighed the evidence, this court "'will not substitute [its] judgment for the trial court's, weigh the evidence, or adjudge witness credibility.'" Winter v. Dep't of Soc. & Health Servs., 12 Wn. App. 2d 815, 839, 460 P.3d 667 (2020) (quoting In re Marriage of Greene, 97 Wn. App. 708, 714, 986 P.2d 144 (1999)). Ditmore's challenge to these findings of fact require us to reassess

Ditmore's, Ray's, and Hilsen's credibility, and reweigh evidence, both of which we will not do on appeal.

Moreover, substantial evidence supports these findings. Ray testified that he saw Ditmore taxiing north, "straddling the line . . . between the ramp and the taxiway," and not making s-turns. Hilsen also saw Ditmore "taxiing fast" and "taxiing straight, not S turning." Ray said that he did not know what Ditmore was doing, so he slowed down to gauge if there was room to pass and moved the Cub "to the right as far as [he] could." Based on Ditmore's location, Ray testified that Ditmore needed either to stop or "get back on the taxiway." Ray said that, because Ditmore was moving closer to the end of the East Ramp, he realized that if he did not take drastic action, there would be a collision. Ray saw Ditmore get back onto the taxiway, and responded by swerving. Hilsen testified that he saw Ray "trying to figure out what to do" and saw him make a "40-degree right turn." While Ray saw and tried to avoid the Stearman, he did not do so in time.

By contrast, no evidence shows that Ditmore saw the Cub and tried to avoid the collision. In fact, Ray said that, after the collision, Ditmore told him that he did not see the Cub, and Ditmore testified that he did not see the Cub when they collided.

Second, Ditmore contends that the trial court applied the wrong standard of care and erred by not concluding that Ray owed him a duty to "see and avoid" under 14 C.F.R. § 91.113(b) and (e). 14 C.F.R. § 91.113(b) provides,

> When weather conditions permit, regardless of whether an operation is conducted under instrument flight rules or visual flight rules, vigilance shall be maintained by each person operating an aircraft so

as to *see and avoid* other aircraft. When a rule of this section gives another aircraft the right-of-way, the pilot shall give way to that aircraft and may not pass over, under, or ahead of it unless well clear.

(Emphasis added). 14 C.F.R. § 91.113(e) provides, "When aircraft are approaching each other head-on, or nearly so, each pilot of each aircraft shall alter course to the right." While not using the term "see and avoid," the trial court concluded both Ray and Ditmore "had a duty to exercise ordinary care to avoid a collision when operating their planes while taxiing," and "a duty to see what would be seen by a person exercising ordinary care."

Ditmore contends the trial court erred by not concluding that Ray breached the duty to see and avoid, and by not concluding that Ray's breach caused or contributed to the collision. Ditmore says Ray "could have easily avoided Ditmore's plane had he exercised vigilance sooner than he did."

The court concluded that Ray operated the Cub with ordinary care and "saw what was available to see as he piloted his plane south on the taxiway." In determining that Ditmore's breach was the proximate cause of the collision, the trial court concluded that Ditmore did not operate the Stearman with ordinary care and his "failure to make S turns caused him to not see what was available to see in front of him (i.e., Ray's Piper Cub)." It also determined that "[b]ecause Ditmore's taxing speed was too fast for the conditions, he deprived Dr. Ray of valuable time he needed to attempt to avoid the collision."

Findings of fact 20, 21, 22, 23, and 24, support the court's conclusion that Ditmore's speed and failure to make s-turns "deprived Dr. Ray of valuable time

he needed to attempt to avoid the collision." Thus, the trial court did not err with respect to any failure by Ray to see and avoid Ditmore's plane.

4. Keeping Proper Distance

Ditmore correctly notes that he and Ray had a concurrent duty to keep a proper distance under 14 C.F.R. § 91.111(a), which provides, "No person may operate an aircraft so close to another aircraft as to create a collision hazard." Ditmore contends the trial court erred when it attributed sole liability to him. He says the court should have determined that Ray concurrently breached the duty to keep proper distance.

Ditmore asserts that Ray admitted there would not be enough room for the planes to pass each other safely on the taxiway. But Ray testified that if the planes positioned their wheels to the edge of the taxiway, as is "common procedure [when] people . . . taxi toward each other, . . . there would be ample room for both" planes to pass without their wings touching. Ray also provided a scale drawing depicting the space the planes would have had to pass. Ray explained that by the time Ditmore pulled onto Taxiway A from the East Ramp, Ray was "pretty much close to the corner of the ramp." Ray said he was beyond the other taxiways where he could have safely pulled off to avoid the collision.

As discussed above, the court's findings support its conclusion that Ditmore's speed and failure to make s-turns "deprived Dr. Ray of valuable time he needed to attempt to avoid the collision" and that Ditmore was the sole proximate cause of the collision. Thus, the court did not err.

5. Taxi Procedure

Ditmore contends the trial court erred by not determining that Ray owed him a duty to follow taxi procedures, Ray breached that duty, and that breach caused or contributed to the collision. But Ditmore cites no FARs, AIM, or ACs to support this contention. Thus, he fails to show how the trial court erred.[6]

6. Medical Certification

Ditmore contends the trial court failed to recognize Ray was "negligent as a matter of law" for operating the Cub without proper medical certification. 14 C.F.R. § 61.23 requires pilots to maintain certain medical certificates depending on the type of piloting they are doing. See also 14 C.F.R. § 68.3 (requiring the completion of a medical education course, which also requires a medical certification). However, we consider violations of FARs as evidence of negligence and not negligence per se. See RCW 5.40.050.

Preliminarily, the trial court did not consider the evidence of Ray's lack of medical certification, finding it inadmissible under ER 403 and 404(b). Ditmore does not challenge this evidentiary decision, so we need not consider his contention that Ray's lack of medical certification caused or contributed to the collision.

---

[6] Ditmore says the taxiway was one-directional. And he correctly notes that Hilsen testified that "taxiways are one directional." But Hilsen also testified that "[t]he culture in aviation is that if you can see somebody coming, that if there is a place to turn off, we turn off." And Ray testified that he was beyond any possible place to turn off when Ditmore reentered Taxiway A.

17

Even if we did consider the contention, it lacks merit. The trial court concluded:

> [T]he evidence suggests, but was not conclusive, that Dr. Ray should have had certain medical documentation in place before operating his plane on the date of this collision. Assuming without deciding that Mr. Ditmore presented sufficient evidence on this subject, it does not change the outcome. First, Dr. Ray's medical history is irrelevant to the collision that is at issue in this case. . . . Had the court considered the evidence, it also would not have changed the outcome because any duty that Dr. Ray had to have different medical documentation in place on the date of this collision cannot be said to have been a duty owed to Mr. Ditmore, therefore any breach of the duty is not a legal proximate cause of the September 15, 2017 collision.

Ditmore contends the court should have determined "the accident would not have occurred but for Ray's decision to violate the FARs and fly without medical certification." But Washington courts have rejected similar arguments in the context of automobile accidents. See, e.g., Weihs v. Watson, 32 Wn.2d 625, 629, 203 P.2d 350 (1949) (where an unlicensed truck driver failed to stop at a stop sign, the court held, "Whether or not the driver of the truck possessed a license, the accident would, under the facts of the case, have occurred just the same"); Kappelman v. Lutz, 141 Wn. App. 580, 586, 170 P.3d 1189 (2007) (the trial court did not abuse its discretion in refusing to admit evidence that the motorcycle driver was unlicensed because it was "not relevant to how and why he drove his motorcycle in the way he did on the evening of this accident, only his driving conduct is relevant"). Any lack of medical certification did not relate to the cause of the accident.

C. Remaining Challenges to Findings of Fact

In addition to findings of fact 16, 20, 21, 22, 23, 24, and 36, discussed above, Ditmore challenges findings of fact 18, 28, 29, 30, 31, 32, 34, and 35. Ditmore does not support his challenge to findings of fact 18, 28, and 30 with argument, so those findings are not properly before us. Findings of fact 29, 31, 32, 34, and 35, are properly before us yet supported by substantial evidence.

Ditmore assigns error to findings of fact 18, 28, and 30, but does not present supporting argument. To challenge a finding of fact on appeal, the appellant must "present argument to the court why specific findings of fact 'are not supported by the evidence and . . . cite to the record to support that argument.'" In re Disciplinary Proceeding Against Cottingham, 191 Wn.2d 450, 462, 423 P.3d 818 (2018) (alteration in original) (quoting In re Disciplinary Proceeding Against Haskell, 136 Wn.2d 300, 311, 962 P.2d 813 (1988)). We "will only review a claimed error which is included in an assignment of error or clearly disclosed in the associated issue pertaining thereto." RAP 10.3(g). "A party abandons assignments of error to findings of fact if it fails to argue them in its brief." Valley View Indus. Park v. City of Redmond, 107 Wn.2d 621, 630, 733 P.2d 182 (1987). Because Ditmore does not support his challenges to findings of fact 18, 28, and 30 with argument, he abandons them and they are verities on appeal.

Ditmore contends findings of fact 29, 31, 32, 34, and 35 conflict with the trial testimony. Ray responds that Ditmore's assignments of error to these findings are "a challenge to witness credibility and the persuasiveness of the

19

evidence," which this court should not reweigh. We agree with Ray that the challenges to these findings hinge on witness credibility and thus we do not consider them.

When a trial court has weighed the evidence, this court "'will not substitute [its] judgment for the trial court's, weigh the evidence, or adjudge witness credibility.'" Winter, 12 Wn. App. 2d at 839 (quoting In re Marriage of Greene, 97 Wn. App. at 714). Ditmore's challenges to these findings of fact require analysis the appellate court may not undertake.

Findings of fact 31 and 32 provide:

31. The court finds the testimony of Mr. Mark Hils[e]n to be credible and has afforded it great weight. Mr. Hils[e]n obtained his law degree in 1986, worked for the Lee Smart law firm after he graduated from law school, and began flying commercially for United Airlines in 1987. Over the course of his career, Mr. Hils[e]n captained both the 747 and the 777. He retired from United in 2017. He continues to fly private aircraft and to volunteer his time as a flight instructor. He has extensive flight instructor qualifications and has been instructing others since he was 18 years old. He has experience with both planes involved in this collision. He has become extremely familiar with the Stearman biplane through his daughter, who owns and pilots her own Stearman.

32. Mr. Hils[e]n witnessed the collision. Through his testimony, he explained that he and a friend were sitting in Ellie's restaurant, looking out the picture window that faces Taxiway A. He observed both planes; the Piper Cub was about 300 feet away from him, and the Stearman was about 900 feet away from him, when he first saw each. He did not necessarily observe the planes at the same time. He noticed that the Piper Cub was taxiing at a normal to slow taxi speed. He took note that the Stearman was not making S turns and was taxiing fast, between 7 & 11 knots.

The findings depend on the credibility of Hilsen's and Ray's testimony.

Finding of fact 29 provides,

Mr. Ditmore described the accident differently. Mr. Ditmore admits that he did not see Dr. Ray's Piper Cub, but asserts that he was deceived into believing that the Piper Cub was not on the taxiway because the plane's wing lights were not illuminated when he says he saw the plane at the fuel depot. The court looked carefully at Mr. Ditmore's explanation for how the accident happened, assessed it against other evidence, and concludes that much of Mr. Ditmore's explanation is unsupported by the evidence and is therefore unreliable.

The trial court weighed the credibility of Ditmore's testimony and found it "unsupported."

Findings of fact 34 and 35 state:

34. Mr. Hils[e]n testified that the Stearman's pace did not alarm him because he assumed that the pilot had seen the Piper Cub and was trying to quickly maneuver to a parking place in front of Ellie's Restaurant. When the Stearman was approximately 50 to 75 feet before the end of the East Ramp, Mr. Hils[e]n realized that the Stearman was not going to turn east and park, he realized the pilot was going to continue northbound on the taxiway. He saw Dr. Ray straining against his shoulder straps, looking over his plane, trying to figure out what to do and where to go. He saw the Piper Cub make an emergency evasive maneuver to try to avoid the collision and described that the effort almost worked, but that the Piper Cub's wing tip caught on the Stearman's end strut. He testified that the Stearman is a much heavier plane than the Piper Cub and when the collision occurred, the Stearman violently picked up the Super Cub and flipped it 180 degrees. He also saw a piece of the Super Cub shoot up out of the plane.

35. After hearing the contested testimony and considering it in the light of all of the other evidence, the court concludes that Mr. Ditmore was not making S turns when he taxied the Stearman in the East Ramp area and that he was also taxiing at a speed that was not safe for the conditions.

To challenge these findings, Ditmore cites his own testimony, "Did four and a half S-turns by the time . . . the airplane went come [sic] and struck my left wing strut." But when the court looked closely at Ditmore's explanation of the collision,

assessing it against the other evidence, it concluded that the explanation was unreliable. The court found Hilsen credible and afforded his testimony great weight. Hilsen testified Ditmore did not perform s-turns and Ditmore's failure to perform s-turns, exacerbated by his speed, was dangerous. He also testified that the use of anti-collision lights was unlikely to have changed the outcome because airplanes are big and visible from "a long way[] away." He said that if Ditmore had been making s-turns, he would have seen the Cub. Because we will not reweigh credibility determinations, we do not consider Ditmore's challenges to these findings of fact.

D. Attorney Fees

Ray contends that Ditmore's appeal is frivolous and requests attorney fees under RAP 18.9. He says no reversible issue exists. We disagree.

We may order a party who files a frivolous appeal to pay terms or compensatory damages to "any other party who has been harmed." RAP 18.9. An appeal is frivolous "if there are no debatable issues on which reasonable minds can differ and is so totally devoid of merit that there was no reasonable possibility of reversal." Shrauner v. Olsen, 16 Wn. App. 2d 384, 422, 483 P.3d 815 (2020). "All doubts as to whether the appeal is frivolous should be resolved in favor of the appellant." In re Marriage of Schnurman, 178 Wn. App. 634, 644, 316 P.3d 514 (2013). "An appeal that is affirmed simply because the arguments are rejected is not frivolous." Id.

While Ditmore does not prevail on appeal, his arguments are not so devoid of merit that there was no reasonable possibility of reversal. He raised a

debatable issue as to whether the trial court erred in finding him solely responsible for the collision.  We deny Ray's request for attorney fees under RAP 18.9.

We affirm.

_Chun, J._

WE CONCUR:

_Bruman, J_          _Verellen J_